In re ALIEN CHILDREN EDUCATION
LITIGATION.

MDL No. 398.

United States District Court,
S. D. Texas,
Houston Division.

July 21, 1980.

Peter A. Schey, Los Angeles, Cal., Isaias Torres, Antonio Guajardo, Houston, Tex., Jane Swanson, Beaumont, Tex., Virginia Schramm, Tyler, Tex., Alfredo Campos, Larry Mealer, Dallas, Tex., for plaintiffs.

Drew S. Days, III, Asst. Atty. Gen., Robert J. Reinstein, Joseph D. Rich, Linda E.

Carter, F. Lamont Liggett, Attys., U. S. Dept. of Justice, Washington, D. C., J. A. "Tony" Canales, U. S. Atty., Houston, Tex., for plaintiff–intervenor.

Mark White, Atty. Gen. of Texas, John W. Fainter, Jr., First Asst. Atty. Gen., Ted L. Hartley, Executive Asst. Atty. Gen., Paul R. Gavia, Chief, State and County Affairs, Susan J. Dasher, Gregory Wilson, Asst. Attys. Gen., Austin, Tex., for defendants; Bowen L. Florsheim, Dallas, Tex., of counsel.

Hurst Hannum, Amy Young–Anawaty, Washington, D. C., for amicus curiae.

## I. INTRODUCTION

SEALS, District Judge.

This case concerns what has evolved into the most important institution in this country: the public school. Our public schools no longer exist merely to supply the tools which provide access to the economic bounty and participatory process of this nation. With the decline of the influence possessed by other institutions in our society such as the family and church, the schools are being called on to perform additional functions. Public school teachers are being required to perpetuate our culture and to provide a moral compass for our children.

Children are the basic resource of our society. Appropriately enough, these cases were consolidated during the Year of the Child. Children will be the parents of the next generation, and it will be their task to carry on the work of this nation.

In this day we must examine the proper roles of the state and national governments in our federal system. The last three decades have been marked by federal involvement in the affairs of local schools. While all must recognize this as a move toward social justice, many question whether the quality of education has benefited. Many more have questions about the limits of the federal response.

It is the responsibility of the federal government to regulate immigration. As a country without a new frontier, we no longer relish our role as a haven for immigrants. The evidence in this case conclusively disclosed a failure of legislative will. There is little effort to make the hard choices about the contours of our policy on Mexican immigration. A quota is set without much deliberation because all know it will be effectively disregarded. The border is no barrier and employers are hospitable. Those who promote lawlessness by ignoring the laws are held largely blameless. Those who cross the border to find work are scornfully treated as criminals without rights.

These concerns, however, do not control the disposition of the issues before the court. Indeed, to some extent, they must be ignored altogether because the question here is not what should be done about the confluence of these problems. The court must determine whether the State's reaction to them is permissible. The question is not whether the contested state law is wise or short–sighted, but whether it is constitutional.

At issue is a statute which prohibits the use of a state fund to educate persons who are not citizens of the United States or "legally admitted aliens." [1] Tex.Educ.Code Ann. tit. 2, § 21.031 (Vernon 1980). That statute by negative implication also permits local school officials to exclude undocumented children from the public schools. Plaintiffs assert that the statute denies them equal protection of the laws, is pre–empted by federal legislation, and conflicts with federal treaties and foreign policy.[2]

---

[1] In order to promote clarity, the court will refer to persons who are not citizens and who were not authorized to enter the country as "undocumented." Aliens who have been authorized to enter and who have not exceeded their authorization will be described as "resident aliens."

[2] The plaintiffs also have asserted that the statute denies them due process of law. The application of § 21.031 is an issue which is not properly a part of the consolidated action. The State has delegated to the school districts the authority to determine who is a "legally admitted alien." Any inquiry about the procedural safeguards which should accompany that decision should be resolved in the transferor courts.

After describing the procedural posture of this case, resolving the pending motions, and discussing the history and effect of the challenged statute, the court will consider each of these contentions in order.

### A. Procedural Posture

In September, 1978, four complaints were filed in the Southern District of Texas against the State and three local school districts.[3] Subsequently a similar action was filed in the Northern District of Texas in April, 1979,[4] followed by two suits in the Western District.[5] The State of Texas and the Texas Education Agency (TEA) were named as defendants or were granted permission to intervene as defendants in these actions. The complaints were later amended to name the Governor of the State of Texas and the Commissioner of Education as defendants. These defendants will be referred to collectively as the State.

In September 1979, the State filed a petition with the Judicial Panel on Multidistrict Litigation. The Panel, on November 16, 1979, issued an Opinion and Order finding that the claims against the State involved common questions of fact and that centralization of these claims in the Southern District of Texas for co-ordinated or consolidated pretrial proceedings would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. The Panel also concluded

that the claims against the various school districts and school board members involved few, if any, common questions of fact. Accordingly, these claims were severed from the co-ordinated or consolidated pretrial proceedings and remanded to their respective transferor districts.[6] These severed claims have been held in abeyance pending resolution of the plaintiffs' claims against the State.

On January 11, 1980, the United States filed a motion to intervene and a complaint-in-intervention asserting that section 21.031 violates the equal protection clause of the fourteenth amendment. By order of February 1, 1980, the court granted the motion to intervene. The State filed a motion to add the United States as a third-party defendant. Pursuant to Rule 14(a), Fed.R.Civ.P., a third-party action is not appropriate against a party to the action. Additionally, in this action for declaratory and injunctive relief, the United States is in no way secondarily liable to the State and any "liability" of the federal government is not dependent on the outcome of the plaintiffs' claim. *See* 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1446 (1971). The State's motion was denied.

After receiving the Opinion and Order transferring these cases for consolidated pretrial proceedings, the court held a con-

---

Each school district has its own administrative procedures and it would serve no purpose to examine the appellate procedure of the Texas Education Agency without reference to local procedures.

3. These actions were styled: *Martinez v. Reagen*, C.A. No. H–78–1797, filed September 18, 1978; *Cardenas v. Meyer*, C.A. No. H–78–1862, filed September 27, 1978; *Garza v. Reagen*, C.A. No. H–78–2132, filed November 6, 1978; *Mendoza v. Clark*, C.A. No. H–78–1831, filed September 22, 1978.

4. *Doe v. Wright*, C.A. No. 3–79-0440–D.

5. *Roe v. Holm*, MO–79–CA–49; *Coe v. Holm*, MO–78–CA–54.

6. Four tag–along actions originally filed in the Southern District of Texas have since been consolidated by this court. *See* Rule 10(b) of the Rules of Procedure of the Judicial Panel on

Multidistrict Litigation; Rule 9(B), Local Rules of the United States District Court for the Southern District of Texas. Those cases are the following: *Cortes v. Wheeler*, C.A. H–79–1926, filed September 20, 1979; *Rodrigues v. Meyer*, C.A. H–79–1927, filed September 20, 1979; *Adamo v. Reagen*, C.A. H–79–1928, filed September 20, 1979; *Arguelles v. Meyer*, C.A. H–79–2071, filed October 4, 1979. Six additional cases originally filed in the Eastern District of Texas have been consolidated with this case. Those cases are as follows: *Doe v. Sulphur Springs*, P–79–31–CA, filed October 29, 1979; *Doe v. Lodestro*, B–79–618–CA, filed September 18, 1979; *Doe v. Ford*, TY–79–351–CA, filed September 28, 1979; *Roe v. Horn*, TY–79–338–CA, filed September 24, 1979; *Roe v. Como–Pickton*, P–79–234–CA, filed October 19, 1979; and *Poe v. Chappel Hill*, TY–79–449–CA, filed December 10, 1979.

ference on December 20, 1979, to discuss the schedule for conducting the consolidated pretrial proceedings. At that hearing the parties agreed to have this court rule on the claim that the State statute is unconstitutional.[7] Pursuant to that agreement the court scheduled a hearing on the merits which was held from February 19 through March 27, 1980. The parties then filed briefs with the court, the last of which was received on June 5, 1980.

The court, once again, wishes to express its appreciation to the lawyers for preparing this case for trial within the time constraints imposed by the court. A great deal of discovery was conducted within a relatively short time in order to facilitate hearing this case at the earliest date. The lawyers for all parties attempted to co-operate with one another to enable the court to hear all the evidence reasonably necessary to frame this important question. Although the period for post-trial briefing extended longer than originally contemplated, this is understandable considering the amount of evidence received and the complexity of the issues.

### B. Pending Motions

#### 1. Defendants' Motion to Dismiss.

■ The state filed a motion to dismiss urging the court to abstain in this action.[8] The State claims that Burford-type abstention is appropriate because this case involves predominant state interests. Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In BT Investment Managers, Inc. v. Lewis, 559 F.2d 950 (5th Cir. 1977), the court of appeals stated that this type of abstention was appropriate in cases involving matters "such as regulation of natural resources, education, or eminent domain, where a paramount state interest is apparent, where the history of state judicial experience in the area indicates special reliability, or, even absent an established regulatory scheme, where the intrusion of federal adjudication might handicap state government." Id. at 955 (footnotes omitted). See Stainback v. Mo Hock Ke Lock Po, 336 U.S. 368, 383–84, 69 S.Ct. 606, 614–615, 93 L.Ed. 741 (1949). Over thirty years have passed since the Supreme Court decided Stainback. A great deal of litigation has occurred in that time and the need for that litigation attests that "the history of state judicial experience in the area [does not] indicate special reliability." Lewis, supra. Cf. Griffin v. Prince Edward County School Board, 377 U.S. 218, 229, 84 S.Ct. 1226, 1232, 12 L.Ed.2d 258 (1964). It is no longer persuasive to argue that federal courts should defer to the state courts when discrimination in education is alleged. Burford-type abstention is inappropriate and the State's motion to dismiss is denied.

**7.** On December 20, 1979, the parties made a joint motion to resolve in this court the issue of the constitutionality of the state statute. The Judicial Panel on Multidistrict Litigation, of course, did not transfer these cases for such a resolution but only for consolidated pretrial proceedings. It would have been inappropriate for this court to grant a motion for a change of venue transferring the cases originally filed in the other districts to this court; they could not "have been brought" here. The plaintiffs and defendants do not reside in this district and the causes of action arose elsewhere. See 28 U.S.C. §§ 1391(b) & 1404(a). But see Buffalo Teachers Federation, Inc. v. Helsby, 426 F.Supp. 828 (S.D.N.Y.1976) (holding that the New York Public Employment Relations Board resided in New York City as well as Albany). Neither the convenience of the parties nor judicial economy, however, would be promoted by remanding the cases for trial of the one controlling issue in four different districts. Accordingly, the parties waived proper venue and consented to have the issue resolved in this court. 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3866 at 379 (1976). The court ratified that consent.

**8.** The State's motion also urges the court to dismiss one of the consolidated actions because certain plaintiffs had not exhausted their administrative remedies, thus leaving this action unripe for adjudication. Similar motions have not been filed in all of these consolidated cases and there is no need to address that issue for the purposes of this consolidated proceeding. Further, there is no question that certain of the plaintiffs are undocumented; exhaustion of administrative remedies would in their case be futile. Finally, the administrative remedies provided by some of the school districts are, at best, cursory. See Record, Vol. XII, 2066–67.

## 2. Plaintiffs' Motion For Partial Summary Judgment.

On the basis of *Doe v. Plyler*, 458 F.Supp. 569 (E.D.Tex.1978), the plaintiffs have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. They argue that the doctrine of collateral estoppel precludes relitigation of the questions actually decided in *Plyler*: Whether section 21.031 violates the equal protection clause of the Fourteenth Amendment; whether it is preempted by the Immigration and Naturalization Act.

■ In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court stated that collateral estoppel "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–329 [91 S.Ct. 1434, 1442–1443, 28 L.Ed.2d 788] (1971)." The doctrine of collateral estoppel should be applied when three requirements are satisfied:

(1) The issue to be concluded must be identical to that involved in the prior action;

(2) In the prior action the issue must have been actually litigated; and

(3) The determination of the issue in the prior action must have been necessary and essential to the resulting judgment.

*International Ass'n of Mach. & Aero Workers v. Nix*, 512 F.2d 125, 132 (5th Cir. 1975). *See Port Arthur Towing Co. v. Owens–Illinois, Inc.*, 492 F.2d 688, 692 n.6 (5th Cir. 1974); *James Talcott, Inc. v. Allahbad Bank, Ltd.*, 444 F.2d 451, 458–59 (5th Cir. 1971).

■ It is readily apparent that the issue in *Plyler* was not identical to that in this case. Both the pleadings and the order in *Plyler* demonstrate that the *Plyler* case involved only the constitutionality of section 21.031 as applied by the Tyler Independent School District.[9] After the court entered its judgment in *Plyler*, the State moved to reopen the case to present additional evidence.[10] Judge Justice, in denying the State's motion, stated that there was no need to re-open the case since "the amended complaint does not state a cause of action against any school district other than the Tyler Independent School District and since this court intends to order relief only against the Tyler Independent School District. . . ." *Doe v. Plyler*, 458 F.Supp. 569 (E.D.Tex.1978). While it is true that the State offered some evidence in *Plyler* that related to the state–wide impact of the statute, the court's order in *Plyler* did not decide that issue. Much emphasis was placed on the small number of undocumented children in the Tyler Independent School District. *Plyler, supra*, at 573, 577 & 590. The issue in this multidistrict litigation is much broader. Although the two cases share a common inquiry, the issue considered in *Plyler* is not identical to that considered in this case.

In addition, even if the issue of the state–wide constitutionality of the statute was decided in *Plyler*, it was neither necessary nor essential to the resulting judgment. The *Plyler* court was not asked to hold the statute unconstitutional throughout the state. It could have granted all of the relief sought without even considering the issue of the facial constitutionality of the statute.

Finally, application of offensive collateral estoppel would be unfair to the State. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 n.14, 99 S.Ct. 645, 651 n.14, 58 L.Ed.2d 552 (1979), the Supreme Court noted that "[a]llowing offensive collateral estoppel

9. When the Judicial Panel on Multidistrict Litigation severed the allegations against the school districts from this consolidated proceeding, their order recognized that the actions against the school districts were not identical to those against the State.

10. The hearing in *Plyler* consumed two days, while this court heard 24 days of testimony and arguments. This indicates that the issues in this proceeding are significantly broader than the constitutionality of the statute in a single school district.

. . . may be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." The State previously had defended successfully the constitutionality of the statute in the state courts. *Hernandez v. Houston Independent School District*, 558 S.W.2d 121 (Tex.Civ.App.–Austin 1977, writ ref'd n. r. e.). That judgment is not binding on the plaintiffs here; they are not the privies of the state court plaintiffs. It would be unfair to allow the plaintiffs, but not the State, to use offensive collateral estoppel in reliance on the one previous judgment in their favor. Accordingly, the plaintiffs' motion for partial summary judgment must be denied.

### 3. Motion to Proceed as a Class Action.

The plaintiffs seek to maintain this suit as a class action. Initially, the court was reluctant to grant the plaintiffs' motion.[11] These consolidated actions were filed in several districts and they challenged the policies of different school districts. Questions about the effect of a particular school district's policy may not be typical of those questions pertaining to the other school districts. Further, the court did not want to postpone the hearing on the merits to take up the class question.

Having heard the evidence, the court concludes that this action should proceed as a class action with respect to the issue litigated in this consolidated proceeding. The transferor courts should consider separately whether the plaintiffs' claims against the various school districts for damages should be maintained as class claims.

It is clear that the class proposed is so numerous that joinder is impractical. Both the sheer numbers and the difficulty of locating class members prevent joinder. Whether section 21.031 is constitutional is a question of law which is common to the class and the claims of the representative parties are typical of the claims of the class. The representative parties, Elvia Mendoza, Miguel Mendoza, Javier Mendoza, and Jorge Mendoza, and their counsel, have represented the class adequately and fairly and the court believes they will continue to do so. Accordingly, the class representatives satisfy the requirements of Rule 23(a). In addition, the court finds that the State has acted on grounds generally applicable to the class and concludes that final injunctive relief is appropriate with respect to the class as a whole. Rule 23(b)(2).[12] The class is defined as all children who are over five and not over twenty-one years of age at the beginning of the scholastic year and have been or will be denied admission to the public schools in the State of Texas on a tuition–free basis because of the alienage provisions of section 21.031 of the Texas Education Code.

---

11. The court originally presumed that class certification would be unnecessary. *See* Manual for Complex Litigation § 1.401 (1977) ("It is rarely necessary, for instance, to maintain a class action in cases in which declaratory or injunctive relief is sought because of the alleged facial unconstitutionality of a federal or state statute or regulation."). This observation is not included in the latest revision of the Manual. Manual for Complex Litigation (Fifth Revision 1980) (Tentative draft). Consideration of the nature of the relief sought and the problems of securing compliance with a judicial decree suggests that a class action is appropriate. Indeed, the case cited by the Manual, *supra*, at § 1.401, in support of the proposition that a class action is unnecessary, *Ihrke v. Northern States Power Company*, 459 F.2d 566, 572 (8th Cir. 1972), was vacated with instructions to dismiss as moot, 409 U.S. 815, 93 S.Ct.

66, 34 L.Ed.2d 72 (1972), presumably because the plaintiffs were no longer subject to the challenged rule and regulations. Further, to deny plaintiffs' motion to proceed as a class action would promote multiplicity of litigation. Finally, "[i]f the prerequisites and conditions of Fed.R.Civ.P. 23 are met, a court may not deny class status because there is no 'need' for it." *Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972). The court concludes that this rationale should be followed in cases not subject to Rule 23(b)(3).

12. The Mendoza children originally sought to represent a class of children in the geographic area of the Goose Creek Consolidated Independent School District. During and after the hearing in this cause, the Mendozas' counsel requested certification of a state–wide class.

## C. The Challenged Statute

Prior to September 1, 1975, the Texas Education Code [13] provided that all children between six and twenty-one years of age were entitled to attend the public schools of the district where they resided. Funds were provided to the school districts by the State in proportion to the school district's average daily attendance. All children were counted in the calculation of average daily attendance provided they satisfied the age and residency requirements. [14]

In April, 1975, the Attorney General of Texas, upon a request made by the Commissioner of Education, issued an opinion holding that *all* children within the State were entitled to attend public schools in the district of their residence regardless of whether they were legally or illegally within the United States. [15] Prior to the Attorney General's Opinion there had been no established policy regarding the admission of undocumented children to the public schools. A small number of school districts excluded undocumented children at that time. [16]

In May, 1975, the Texas Legislature amended the Texas Education Code. The amended statute, Tex.Educ.Code Ann. tit. 2, § 21.031, provides in pertinent part:

(a) All children who are citizens of the United States or legally admitted aliens and who are over the age of five years and under the age of 21 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.

(b) Every child in this state who is a citizen of the United States or a legally admitted alien and who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.

(c) The board of trustees of any public free school district of this state shall ad-

---

13. Tex.Educ.Code Ann. tit. 2, § 21.031 (Vernon 1972).

14. Tex.Educ.Code Ann. tit. 2, § 15.01(b) (Vernon 1972) states that the available school fund "shall be apportioned annually to the several counties of Texas according to the scholastic population of each . . . ." Section 15.-01(c) defines the term "scholastic population" as "all pupils within scholastic age enrolled in average daily attendance the next preceding scholastic year in the public elementary and high school grades of school districts within or under the jurisdiction of a county of this state." After the Texas Education Code was amended to exclude aliens who were not "legally admitted," undocumented children who were permitted to attend public schools were no longer counted in the computation of average daily attendance. Record, Vol. VIII, 300; Plaintiffs' Exhibit No. 286.

15. The Attorney General's Opinion was based on legislative intent and a plain–meaning construction of the statute. The Attorney General stated that "the words 'every' as contained in section 21.031 of the Education Code do not permit exceptions to be created by local boards." Att'y Gen.Op. H.–586 at 3 (1975). The Attorney General's Opinion also stated: "Whether the Legislature itself may establish an exception for illegal aliens has not been decided by the higher courts. While we recognize that the United States Supreme Court

could sustain an exercise of legislative power, the existing case law indicates that the rights of illegal aliens are protected by 42 U.S.C.A. section 1981 and the Fourteenth Amendment to the United States Constitution." The Attorney General concluded that "[u]nder section 21.031 of the Education Code, alien children within the State are entitled to attend public school in the district of their residence, regardless of whether they may be 'legally' or 'illegally' within the United States."

Two previous Attorney Generals' Opinions have held that alien children had the same right to attend public free schools as do the children of citizens. Attorney General Opinion No. 2318, Book 55 at 338 (1921), reached that conclusion construing Articles 2899 and 2900 of the Texas Revised Civil Statutes of 1911. Those statutes contained language almost identical to that used in the Texas Education Code prior to September 1, 1975. Attorney General Opinion O–2318 (1940) stated: "We therefore conclude that the Legislature of this State intended that an opportunity for instruction in the public schools of this State should be afforded the youth of Texas, and the advantages of attending a public school should be extended to all children *regardless of their nationality* or color, *whether citizen or alien,* . . ." [emphasis added].

16. Plaintiffs' Exhibit No. 448 at 5.

mit into the public free schools of the district free of tuition all persons who are either citizens of the United States or legally admitted aliens and who are over five and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district.

. . . . .

Accordingly, undocumented children are not entitled to attend public school and they may not be counted when calculating the average daily attendance which determines the school district's share of the Available School Fund. Local school districts are given the discretion to deny admission or to permit attendance upon payment of tuition.

Needless to say, the effect of the new statute is to exclude undocumented children from the Texas public schools. Although some school districts continue to educate all children, the majority exclude them or require tuition.[17] There was no evidence that any undocumented children are presently attending school upon payment of tuition.[18]

An evaluation of the statute properly may not proceed on the assumption that the statute operates only to prohibit the use of state funds to educate undocumented children. The statute makes a distinction which treats undocumented children differently from all other children with respect to admission to the public schools. Section 21.031(b) & (c). As the court has noted above, the effect of the amendment is to exclude undocumented children from school. Even though some school districts have opted to admit undocumented children, the State's financing scheme penalizes them for that decision; they receive less money per pupil from the State than school districts which exclude undocumented children. Further, the statute was amended by the Legislature immediately after the Attorney General informed the Commissioner of Education that undocumented children were entitled to attend public schools. It is reasonable to conclude that the amendment was a response to the Attorney General's Opinion.[19] Several school districts which previously admitted all children now use the amendment as authorization to exclude undocumented children. Accordingly, it would be sophistry to view this case as one involving only state fiscal policies or the method of financing the schools in Texas.

## II. THE EQUAL PROTECTION CLAUSE

Section one of the fourteenth amendment of the United States Constitution states in pertinent part: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." This provision, "unlike other provisions of the Constitution, confers no substantive rights and creates no substantive liberties. The function of the equal protec-

---

**17.** The plaintiffs introduced as evidence a stratified random sample of the Texas Independent School Districts. Sixty school districts were randomly selected. Twenty–nine school districts were selected with a student enrollment of 10,000 or more and 31 school districts were selected with a student enrollment of less than 10,000. Of the 1,099 school districts, 59 have a student enrollment of greater than 10,000. Of the school districts contacted which had an established policy regarding the admission of undocumented children, 72.9 percent of those school districts responded that they would either exclude all undocumented children or admit them upon payment of tuition. Plaintiffs' Exhibit No. 448 at 6.

**18.** The court notes, however, that there has been evidence in the Tyler Independent School District of children attending as tuition paying students. *Doe v. Plyler*, 458 F.Supp. 569, 575 & 581 (E.D.Tex.1978).

**19.** The court cannot state with absolute certainty what the Legislature intended when passing the amendment to 21.031. Neither the court nor the parties have uncovered a shred of legislative history accompanying the 1975 amendment. There was no debate in the Legislature before the amendment was passed by a voice vote. There were no studies preceding the introduction of the legislation to determine the impact that undocumented children were having on the schools or to project the fiscal implications of the amendment. This supports the conclusion that the amendment contemplated the exclusion of undocumented children from the public schools and is not merely a change in the manner of computing average daily attendance.

tion clause, rather, is simply to measure the validity of *classifications* created by state laws." *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 59, 93 S.Ct. 1278, 1310, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring) (footnote omitted). The equal protection clause insures that legislative classifications are fair and that similarly circumstanced persons are treated alike. States have wide discretion in making classifications unless the classification is based on a suspect criterion or unless the classification affects a fundamental right or interest. *See Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Chatham v. Jackson*, 613 F.2d 73 (5th Cir. 1980). *See generally* Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). When no suspect criterion or fundamental interest or right is involved, the classification must nonetheless be reasonable, not arbitrary, and rationally and fairly related to a valid governmental objective. *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964); *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961). If the classification is based on suspect criteria or a fundamental right or interest is affected, the statute can be upheld only if it is precisely tailored to further a compelling governmental interest. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). This rigid, now traditional, two-tier approach requires the court to examine the right and interest implicated and the nature of the classification created in order to determine the appropriate level of judicial scrutiny.[20]

*A. The Interest Directly Affected: Education*

In 1954 Chief Justice Warren stated:

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate a recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). In other opinions the Supreme Court has re-emphasized the importance of education to members of modern society and has endeavored to insure equal access to educational opportunities. *See, e. g., Ambach v. Norwick*, 441 U.S. 68, 75–78, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49 (1979) (citing cases).

Nonetheless, the Supreme Court has stated that "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution." *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). The equal protection clause, however, does not serve only to protect those rights explicitly recognized in the body of our Constitution. "It is of course true that a law that impinges upon a fundamental

---

**20.** Much has been said and written of late about whether the Supreme Court has abandoned the two-tier approach. Whether or not an "intermediate tier" is now clearly estab-

lished, *see Chatham v. Jackson*, 613 F.2d 73, 80 (5th Cir. 1980), it is possible to state with some certainty that the rational basis test has become somewhat flexible.

right explicitly or implicitly secured by the Constitution is presumptively unconstitutional. *See Shapiro v. Thompson*, 394 U.S. 618, 634, 638 [89 S.Ct. 1322, 1331, 1337, 22 L.Ed.2d 600]; *id.*, at 642–644 [89 S.Ct. at 1335–1337] (concurring opinion)." *Mobile v. Bolden*, 446 U.S. 55, 76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47 (1980).

In *Rodriguez* the Supreme Court considered a challenge to the method of financing public schools in Texas. That method relied heavily on local property taxes. Because of differences in taxable property values among the various school districts, substantial interdistrict disparities in per pupil expenditures resulted. The plaintiffs in *Rodriguez* claimed that the Texas system of financing public education operated to disadvantage children in poor school districts. Because only relative differences in spending levels were involved, the court stated that "no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.*, 411 U.S. at 37, 93 S.Ct. at 1299. The challenged financing provisions excluded no one from the public schools.[21] In *Rodriguez* no children were denied admission because their parents were unable to pay tuition.

The statute challenged in this action is very different. Many children received no education at all, either because the school districts in which they live have decided to deny them admission, or because they cannot afford the tuition required. Those school districts which opt to admit children receive proportionately less state support than those which exercise their prerogative to exclude undocumented children. Under section 21.031, Texas has decided to educate some children within its jurisdiction while absolutely depriving others of the benefit of education.

While holding that a system which contributes more funds for the education of some children than others does not infringe upon a fundamental interest, Justice Powell reserved the question whether absolute deprivation of educational opportunity might require strict judicial scrutiny. This case squarely presents the issue reserved by the Supreme Court in *Rodriguez*: what level of scrutiny should be applied when a statute absolutely deprives educational opportunities to some children within the state's jurisdiction?

The Supreme Court noted in *Rodriguez* that no federal court has the authority to sit as a "super-legislature" and to create substantive constitutional rights. *Id.*, at 33, 93 S.Ct. at 1296. *See Mobile v. Bolden*, 446 U.S. 55, 76, 100 S.Ct. 1490, 1505, 64 L.Ed.2d 47 (1980); *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Nonetheless, when litigants present constitutional claims, the courts must endeavor to determine whether their arguments are supported by the Constitution. The presumptive validity which normally attaches to the actions of state legislatures is no cause to shirk that responsibility. Our system of adjudication requires courts to give their full attention to the parties' assertions, regardless of their novelty. With that said, the court turns to the question whether persons have a fundamental interest in access to education when the state has undertaken to provide it to others.

Education is not among the rights afforded explicit protection by the Constitution. The factors which control the determination of what rights and interests are implicitly guaranteed have not been identified clearly. In *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Court stated:

Long ago in *Yick Wo v. Hopkins*, 118 U.S. 356, 370 [6 S.Ct. 1064, 1071, 30 L.Ed. 220] [1866], the Court referred to "the political

**21.** In *Ambach v. Norwick*, 441 U.S. 68, 77 n. 7, 99 S.Ct. 1589, 1595 n. 7, 60 L.Ed.2d 24 (1979), the Court stated that *Rodriguez* held that "access to education is not guaranteed by the

Constitution." *Rodriguez*, however, did not in any way involve the issue of access to education. *Rodriguez* centered on equality of expenditure, not access.

franchise of voting" as a "fundamental political right, because preservative of all rights." Recently in *Reynolds v. Sims*, 377 U.S. 533, 561–562 [84 S.Ct. 1362, 1381–1382, 12 L.Ed.2d 506] [1964], we said, "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

*Id.* at 667, 86 S.Ct. at 1081–82. According to this formulation, a right is fundamental when it is preservative of or substantially related to other basic civil and political rights which are guaranteed by the Constitution. *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), considered whether there was a sufficient connection between education and the freedom of speech or the right to vote. Although the district court found that education was a fundamental right or liberty, the Supreme Court held that it was not. *Id.* at 37, 93 S.Ct. at 1299. The Supreme Court reasoned that courts could not presume "to possess either the ability or the authority to guarantee to the citizenry the most *effective* speech or the most *informed* electoral choice." *Id.* at 36, 93 S.Ct. at 1298.

Initially, the issue in this case is not whether a state must act affirmatively to maximize the ability of persons within its jurisdiction to exercise rights, but rather whether a state may choose to deny access to education to a discrete group of persons within its jurisdiction. The court has not been asked to insure that the education provided is commensurate for all, or to require the state to maintain an educational system. The plaintiffs seek only to participate in the educational system which has been established and made available to others. This claim does not require a measurement of the quantum of education that is constitutionally protected and it does not imply that any resource which might aid in the exercise of a guaranteed right must be provided. All that is at issue is whether education is so closely connected with guaranteed rights that a total deprivation of education should be closely scrutinized. Before discussing the relationship between education and freedom of speech, it is necessary to inquire whether the legal status of the plaintiffs makes consideration of the right to speak and to vote irrelevant. The court concludes that it does not.

First, there is little doubt that many of the plaintiffs, for good or for ill, are here to stay. The evidence demonstrates that approximately ten percent of the undocumented persons in this country will remain here as permanent settlers.[22] Many of the permanent settlers have relatives living in the United States and have come across the border while they await processing of their immigration documents. Additionally, the current proposals on amnesty could provide citizenship to many undocumented persons who are of school age. *See* H.R. 9531, § 2a, 95th Cong. 1st Sess. 1977; A. Bevilacqua, Legal Critique of President Carter's Proposals on Undocumented Aliens, 23 Catholic Lawyer 286 (1978). Future proposals may increase the number of persons benefiting from amnesty. Presently, many of the un-

---

**22.** Two measurements, stock and flow, are utilized by experts to determine the population of undocumented aliens residing in the United States. The term "stock" refers to the total number of undocumented aliens who enter this country illegally and intend to remain permanently, while "flow" refers to the total number of undocumented persons who enter illegally on a yearly basis for temporary or seasonal employment. Dr. Gilbert Cardenas testified that it is these seasonal and temporary undocumented aliens who comprise the bulk of the apprehension statistics of the Immigration and Naturalization Service (I.N.S.). Many are caught within seventy-two hours after they enter the United States and some will cross the border as often as twenty times in one year. Record, Vol. I, at 68–71; Plaintiffs' Exhibit No. 209 at 12–13. Additionally, Dr. Jorge Bustamante, the foremost expert on Mexican migration, testified that only nine percent of the total flow of undocumented aliens are likely to remain in the United States. Record, Vol. III, 426, 430–31; Defendants' Exhibit No. 14–6, Hansen, Alien Migration, Mexican Workers in the United States and European "Guest Workers" 108.

documented persons in this country enjoy a form of *de facto* amnesty. Federal harboring legislation, in large part as a result of pressure from Texan lobbyists, does its part to insure that employment opportunities continue to attract persons to cross the border. 8 U.S.C. § 1324(a). The State of Texas, unlike other states, has rejected efforts to discourage the employment of undocumented workers. In 1979 and 1977, legislation was introduced which would authorize sanctions against employers who knowingly hired undocumented persons. Neither bill was reported out of the applicable committee. The evidence received indicates that the Congress has not allocated sufficient funds to stem the tide of immigration from Mexico. This nation has set immigration quotas which are simply disregarded. It thus is likely that many of the undocumented persons in this country will remain here for years as a result of government inaction.[23] While they remain in the country they should not be denied the right to speak or to listen. *Cf.* 1 C. Antieau, *Modern Constitutional Law* § 9.26 (1969).[24]

The rights of man are not a function of immigration status. Nonetheless, it has been suggested that a person is not endowed with civil and political rights unless his "entry" into the United States was lawful.

The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of the provisions acknowledges any distinction between citizen and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

*Bridges v. Wixon,* 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring). This "entry" doctrine, properly understood, acknowledges the congressional authority to regulate immigration and the territorial limitation of governmental power to guarantee the enjoyment of rights.

The authority to admit or to exclude aliens is vested by the Constitution in the

---

**23.** The court heard the following testimony from Leonel J. Castillo, formerly the Commissioner of the United States Immigration and Naturalization Service:

Q. You indicated a little earlier on that you felt that in essence the United States had already granted an amnesty to undocumented persons in the United States. Could you expand on that thought a little, please?
A. What I said was that there is a de facto amnesty, certainly not an official policy. But when you contend with immigration and documentation in the state of New Mexico with three investigators for the entire state, you have to come to the conclusion that you are not going to deport everybody in New Mexico who could be deported. That's what I mean by the de facto situation. Further, when the number of investigators is reduced by one-tenth in this year's budget, you have to come to the conclusion that it seems to be a de facto situation, but the efforts to root them out are going to be much more difficult. Record, Vol. VI, 49–50. The Court notes that Congress recently has authorized additional personnel for I.N.S. It is doubtful that this supplement would alter Mr. Castillo's assessment.

**24.** In *Doe v. Plyler,* 458 F.Supp. 569, 581 n. 14 (E.D.Tex.1978), Judge Justice stated:

It is no answer to the *Rodriguez* dictum that the ability of illegal alien children to exercise free speech and participate in the political process is of no concern to the State of Texas. These children, and many more like them, are likely to remain here. . . . The federal government has chosen, either by act or omission, not to deport them. Many of them have younger siblings who are American citizens and who may some day be the means of legalizing the presence of the whole family. Developments in federal immigration policy, such as President Carter's proposed amnesty plan, may legalize their status at a much earlier date. As the Supreme Court has recognized, the benefits of education are not reserved to those whose productive utilization of them is a certainty: "[a]lthough an alien may be barred from full involvement in the political arena, he may play a role—perhaps even a leadership role in other areas of import to the community." *Nyquist v. Mauclet,* 432 U.S. 1, 12, 97 S.Ct. 2120, 2127, 53 L.Ed.2d 63 (1977).

Congress. Questions relating to the admission of aliens often are politically based, *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976), and thus inappropriate for judicial resolution. The "entry" doctrine is tailored to defer to congressional procedures and decisions regarding admission and related conditions on immigration status. Thus a person who has been "paroled" into the United States pursuant to 8 U.S.C. § 1253(h) has not "entered" the country for purposes of immigration laws; they still may be excluded without the protections incident to expulsion. Further, Congress has the power to exclude persons from this jurisdiction for reasons "which would be impermissible in the context of domestic policy." *Pierre v. United States*, 547 F.2d 1281, 1290 (5th Cir.), *vacated and remanded*, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977), *quoting, Fiallo v. Levi*, 406 F.Supp. 162, 165 (E.D.N.Y.1975).

This useful doctrine protects congressional power to perform a congressional function. It has little use, however, when judicial functions are at issue. Accordingly, a determination of whether a person paroled in the United States may be deprived of free speech or equal protection of the laws should not revolve around whether he is subject to expulsion or exclusion. Whether a person physically within this country may exchange ideas should not depend on the nature of the proceedings used to challenge his continued presence here. Essentially, regarding questions not intrinsic to immigration status, the court should not utilize immigration doctrines.[25]

Courts may decide the extent of the liberties and freedoms enjoyed by undocumented persons without treading on congressional control over immigration. This conclusion is bolstered by the nature of deportation proceedings against undocumented persons. Undocumented persons are entitled to due process before they may be expelled. *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958); *Shaughnessy v. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953); *United States v. Murff*, 260 F.2d 610, 614 (2nd Cir. 1958). This is inconsistent with an approach which treats persons who have entered unlawfully like those who have not physically entered or those who have been paroled into the United States. Thus the court considers it incongruous to apply the "entry" doctrine in a manner which justifies denying first amendment rights to persons present in this country. Congressional power to exclude aliens does not imply state power to infringe the rights of undocumented persons within this jurisdiction to receive and to exchange ideas. If a substantial connection exists between first amendment rights and the absolute deprivation of education, the infringement of first amendment rights is not rendered inconsequential by the immigration status of the persons affected.

**25.** A student commentator has stated that

> The "entry" doctrine . . . [is] understandable only as a way to balance important competing policies—the constitutional guarantee of due process to all "persons" within its jurisdiction versus the constitutional commitment to Congress of foreign policy and the related admission of foreign nationals to the United States shores. Thus, the Court has not allowed Congress arbitrarily to deprive resident aliens of life, liberty, or property. The Court has deferred to congressional decisions on the conditions which trigger expulsion of an unnaturalized alien, but has required procedural due process in deportation. This combination of policies strikes a balance between the Court's acknowledging the congressional right to set terms of admission and expulsion, and fulfilling its own responsibility to insure fundamental fairness to any person within the shelter of the Constitution. Finally, the Court has abdicated entirely when Congress excludes an alien still at the threshold or its legal equivalent *i. e.*, parole, and has justified the fictional entry doctrine as a device which allows Congress to be humane in emergencies (medical or political) and to release excludable aliens from custody without losing any flexibility in deciding whom to admit. In sum, the Constitution, in particular the fifth and fourteenth amendments, protects those within American territory. The Court usually sanctions dilution of those guarantees only to the extent necessary to preserve congressional control over the admission and expulsion of foreign nationals.

Comment, 16 Hou.L.Rev. 667, 706 (1979).

Before considering the connection between education and first amendment freedoms, it must be recognized that the evidence demonstrates that the deprivation of education is absolute. As previously noted, many children are excluded from school and others have no ability to pay the tuition required by some school districts. Some make efforts to attend private schools, yet the evidence demonstrates that, even if the plaintiffs could afford tuition, the private schools could not absorb their numbers. The private schools in Texas are unable to accommodate all of the children who seek admission.[26] Other members of the plaintiff class attend alternative schools which have been established to care for some undocumented school age children. The court finds these alternative schools do not provide a substitute for public education, even for those children who are fortunate enough to attend them. The alternative schools lack books, equipment, and adequate facilities. In one alternative school in Houston, only one of the four teachers is certified to teach; two of the four have high school educations.[27] In the other school about which evidence was presented, only one of the two teachers has any formal training as an educator.[28] Even if the schools were adequate at the present, there is no assurance that they will exist in the future. Their funding is insufficient and its continuity is uncertain.[29] Finally, the alternative schools are too few in number and too small in size to serve all of the undocumented children. Many children are just left at home or in the streets.[30]

Second, the evidence demonstrates what common sense suggests: children who are excluded from school suffer great harm. The court finds that the absolute deprivation of education prevents children from assimilating into society and from effectively exchanging information and ideas. Necessarily, this disability is magnified because of the initial language barrier which is left unbreached.

The experts who testified on the effect of the exclusion on children unanimously agreed that the damage caused was severe. Dr. Kenneth Matthews, a specialist in child psychiatry and a consultant to three school districts, testified that he has observed severe behavioral and emotional problems which result from exclusion from the school system and which could plague children all through their lives. He stated:

> Children who are deprived of an education frequently suffer behavioral difficulties which can vary in extent from mild adjustment difficulties, through serious behavior difficulties, like hyperactivity, withdrawing behavior into fairly severe types of difficulties such as depression and breaks with reality. . . . [W]hen a child is not allowed to be educated, . . . there is a decrease in the cognitive function of the child and in the ultimate ability of that child to develop adult type thinking patterns. . . . The longer the exclusion goes, the more severe the effect would be.[31]

Dr. Matthews identified formal education as one of three important variables in a child's development and it is the only one directly affected by government. He testified that the family affords no substitute for formal education.[32] As a whole, Dr. Matthews's testimony indicated that the excluded undocumented children he had examined will have severe difficulty adjusting in a society requiring reading and mathematical skills and that these children are also likely to become permanently dependent on governmental services.

Dr. Lucien Jones, a clinical psychologist, examined one of the named plaintiffs presently excluded from school. He found that she is behind her grade level by one to two years, and behind in general academic

---

26. Record, Vol. VII, 98–142.

27. Record, Vol. V, 687.

28. Record, Vol. VII, 156.

29. Record, Vol. VI, 12–16; Vol. VII, 155.

30. Record, Vol. VII, 105–09.

31. Record, Vol. IV, 594.

32. *Id.* at 612.

knowledge by three and one–half years. Moreover, he found the child withdrawn and indicated that if she continues to be excluded from school her isolation and alienation will only worsen.[33]

Other testimony by educational experts corroborated the conclusions reached by Dr. Matthews and Dr. Jones. Dr. Thomas Carter stated that children excluded from school would be unable to acquire the formal literacy skills which permit progress within a society.[34] He emphasized the permanent nature of this disability; adults rarely learn to read or to write.[35] Dr. Brams, a sociologist specializing in the sociological, historical, and psychological foundations of education, testified about the connection between illiteracy and participation in the nation's political processes. She explained that, because undocumented children come from families with low socio·economic status, their need for education is greater. Without education, persons are unable to participate or even understand our form of government. Uneducated persons will be unaware of the opportunities and protections afforded by our society.[36] The court, having reviewed Dr. Brams's qualifications as an expert witness, concludes that her opinion testimony should be given great weight.[37]

The court also heard testimony from two young girls who had been denied admission to the public schools. Their description of the way they spent their days and of their efforts to educate themselves reinforces the expert testimony. The consequences of excluding only two children are dramatic. As this effect is magnified many times, it is possible to perceive the impact of the creation of a permanent underclass of persons who will live their lives in this country without being able to participate in our society. Additionally, the expert testimony focused primarily on the impact of exclusion from school in the abstract. When this impact is combined with the language barrier which exists, the extent of the problem becomes apparent. The public school has been a mechanism to assimilate immigrants into our society. Uneducated children who eventually will be admitted into this country, will never be admitted into the society.

In Texas the provision of education is a state function and that a person may look to private schools instead does not alter this fact. Section 1 of Article VII of the Texas Constitution states: "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." References to public education were contained in the Constitution of the Republic of Texas enacted in 1836. The first State Constitution adopted in 1845 represented the diversity of opinion then prevailing re-

**33.** Record, Vol. XI, 1256–68. *See also* Plaintiffs' Exhibit No. 293.

**34.** Record, Vol. II, 222. In addition Dr. Carter's testimony states:

[W]e can very well say with perhaps a few individual exceptions that [an excluded] child would be illiterate, would be unable to read and unable to write. The child would also miss much of the . . . social training relative to the laws, the customs, the procedures, the organization of the society; that aspect of the formal [socialization] of the child would be missing. [These children] would probably be unable, with the lack of these skills, to integrate themselves into the society as productive members of society. The possibility of an illiterate person [growing] up and functioning at anything but marginal social levels in this industrial, technically advanced society is very hard to picture.

He or she would be unable to complete the most rudimentary forms of application for work, which would restrict the individual to those kinds of jobs that would require no training, etc. As you know, these kinds of jobs are disappearing in our society. Cognitively, the child would be unequipped to cope with modern industrial society. *Id.* at 223–24.

**35.** Record, Vol. II, 287–89. *See also* Record, Vol. VII, 125-29.

**36.** Record, Vol. X, 1171–75.

**37.** Plaintiffs' Exhibit No. 288. *See generally* Record, Vol. X, 1139–75, 1179, 1180–81 & 1184–87.

garding the state's duty to provide free public education to all children seeking it. The Constitution of 1869, however, settled the question and "required for the first time a uniform system of public free schools for the gratuitous instruction of all inhabitants between the ages of six and eighteen (art. IX, sec. 1) with compulsory attendance (art. IX, sec. 5) and a highly centralized system of school administration (art. IX, sec. 3)." Vernon's Ann.Tex.Const. art. VII, sec. 1 (1876) (interpretative commentary). In 1884, with the enactment of the school law, the idea of universal public education became completely accepted in Texas.

Current statutory provisions reflect the State's control of education. One need only cite the compulsory attendance law, Tex. Educ.Code Ann. title 2, Sec. 21.032 (Vernon's 1972), to illustrate the State's involvement in education. The State's ability to compel attendance reflects the social recognition of the governmental interest in educating all persons within the jurisdiction.

Other areas which may be occupied by state activity do not share with education the connection to the essence of government. If the state operates a utility or public transportation in the locale, those activities constitute a government invasion of or supplement to the private sector, not essential state functions.

The provision of education also is quite dissimilar from "the bounty that a conscientious sovereign makes available to its own citizens and some of its guests." *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976). Additionally, the State's educational system cannot properly be classified within "the area of economics and social welfare. . . ." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). When a state enters an area occupied by the private sector and endeavors to assist persons to obtain food, shelter, or medicine, there is no requirement that the state create classifications which are perfect. A state may un-

dertake charitable functions without undue concern about making distinctions which are too fine or too imprecise. Such determinations are replete with "conflicting claims of morality and intelligence . . . raised by opponents and proponents of almost every measure. . . ." *Dandridge v. Williams, supra,* at 487, 90 S.Ct. at 1162. The legislatures are entrusted to resolve conflicts concerning the boundaries of state involvement in these areas.

■ Judicial deference, however, should be limited in areas which are occupied by state functions. Where the state traditionally has been the provider, discrimination with respect to access to a service should be disfavored when there is a close connection between the particular service and the implicitly or explicitly protected constitutional right. In effect, this is another way of saying that with respect to a service which is provided as an essential function of government and not by the private sector, exclusion from access to that service will result in absolute deprivation. This should be scrutinized carefully.

■ One reason supporting the Supreme Court's decision in *Rodriguez* not to classify education as a fundamental interest was that "the logical limitations" of the plaintiffs' theory were "difficult to perceive." *Rodriguez, supra,* 411 U.S. at 37, 93 S.Ct. at 1299. No such open ended theory is involved in this case. When only *access to* education is deprived, holding that a fundamental interest is involved does not occasion an unprecedented upheaval which would terminate state control over education. An interest in a governmental process or program may be deemed fundamental even though the government cannot be required to assure or even to determine what constitutes enjoyment of that process or program. An analysis of the extent of the right to vote is instructive.

The right to vote requires quantitative and not qualitative protection.[38] Thus,

---

**38.** Professor Tribe has described the right to fair and effective representation as a qualitative aspect of the right to vote. L. Tribe, Amer-

ican Constitutional Law § 13–7 (1978). The *court, however, believes that apportionment schemes which cancel or minimize the voting*

while "a citizen has a constitutionally *protected right*, to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) in states that have adopted the electoral process, the courts do not sit to insure "the most *informed* electoral choice." *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 36, 93 S.Ct. 1278, 1298, 36 L.Ed.2d 16 (1973). The plurality opinion in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), illustrates the principle that the recognition of access to the ballot as a fundamental right does not imply a right of equality of result. The only occasion that makes the equality of result actionable is when such inequality constitutes invidious discrimination because of the nature of the classification used or the group affected. The "right to participate in elections on an equal basis with other qualified voters" does not herald a revamping of the political system. The "right to have an equally effective voice" in the election of representatives is impaired where representation is not apportioned substantially on the basis of population. Such an inquiry is objective and quantitative. It provides no license for the court to embark on subjective, qualitative analyses of the effect of elections on distinctive groups or to guarantee the right to representation. The mere presence of a voting rights issue does not compel strict scrutiny. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978); *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977); *Sayler Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Creel v. Freeman*, 531 F.2d 286 (5th Cir. 1976), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977); Note, 93 Harv.L.Rev. 1491 (1980). *See also Clark v. Town of Greenburgh*, 436 F.2d 770 (2nd Cir.

1971). Finally, classifying access to the ballot as a fundamental right does not require the states to make all government offices elected ones. Once the state has granted the franchise, however, restrictions on the right to vote elicit strict scrutiny. *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

Similarly, recognition of a right to access to education need not imply a right to equality of result, thus undercutting the holding in *Rodriguez*. Where inequality of educational opportunities results from racial animus, such discrimination will be struck down upon proof of racially discriminatory intent or purpose. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The right to attend school on an equal basis with other children living in the locale does not require revamping the educational system. Any inquiry into the exclusion of children from public education can be objective and quantitative. Recognition of education as a fundamental right does not mean that the presence of educational issues in a lawsuit will require subjective, qualitative analysis concerning the effect of education on all discrete groups.

■ In summation, the court concludes that strict judicial scrutiny should be applied to determine whether the statute violates the equal protection clause. The bases for this conclusion are the following: the statute absolutely deprives undocumented children of access to education thereby causing them great harm; there is a direct and substantial relationship between education and the explicitly guaranteed right to exchange ideas and information; and, the provision of education is not a social or economic policy but a state function. Additionally, recognizing the right to access to education when it is being provided to others does not imply a right to equal enjoyment of education.

power of cognizable population groups elicit strict scrutiny only when the nature of the population group compels it. Thus racial and ethnic groups by themselves deserve special solicitude without reference to any qualitative

aspect of the right to vote. *Compare Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), *with White v. Register*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

## B. The Classifications Created by Section 21.031

### 1. Undocumented Aliens

Section 21.031 on its face creates a classification of undocumented [39] children who are treated differently than all other children within the jurisdiction. The court must determine not only what level of scrutiny should be applied to the use of such a classification, but also whether any scrutiny is due. While the plaintiffs claim that discrimination against undocumented aliens is inherently suspect, the State claims that it is permissible *per se*.

With respect to the plaintiffs' argument, the court concludes that states may treat citizens and resident aliens differently than undocumented aliens, provided that such differences are reasonably related to a valid governmental objective and do not affect fundamental rights. If fundamental rights are affected, state treatment of undocumented aliens, like state treatment of other persons within its jurisdiction, is justified only if it furthers a compelling governmental interest.

In *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), the Supreme Court stated that "classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny." The equal treatment of resident aliens is based on two premises. First, the federal decision to admit resident aliens to permanent residence required "a general policy that all persons in this country shall abide in any state 'on an equality' of legal privileges with all citizens under non-discriminatory laws." *Takahashi v. Fish & Game Comm'n.*, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478 (1948). Second, in *Graham v. Richardson, supra,* the court stated that "[a]liens as a class are a prime example of a discrete and insular minority . . . for whom . . . heightened judicial solicitude is appropriate." *Id.*, 403 U.S. at 372, 91 S.Ct. at 1852, *citing United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S.Ct. 778, 783–784 n.4, 82 L.Ed. 1234 (1938). Undocumented aliens are "saddled with such disabilities, . . . subjected to such a history of purposeful unequal treatment [and] relegated to such a position of political powerlessness . . ." that treating them as more discrete and insular than resident aliens may be justified.[40] Nonetheless, undocumented aliens are not entitled to the privileges conferred by admission to the country. The federal decision to admit resident aliens would be frustrated by state restrictions on their activity. *Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). The federal government has made no such decision concerning undocumented aliens.

---

**39.** The statute excludes alien children who are not "lawfully admitted." This expression, perhaps as a result of the unfortunate complexity of our immigration laws, is a monument to ambiguity. The Texas Education Agency, however, has promulgated guidelines for the implementation of section 21.031 in Rule 26.51.01.-010, Texas Register, February 19, 1980.

**40.** The court notes that undocumented status is not a characteristic which an individual cannot control. Uncontrollable characteristics are those which bear no "relationship to individual responsibility or wrongdoing." *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1407, 31 L.Ed.2d 768 (1972). Although undocumented persons may be powerless to change immediately their status *to* that of a resident alien or that of a citizen of the United States, undocumented *adults* have control and individual responsibility for their present status. Further, citizens and resident aliens may be distinguished from undocumented aliens without stigmatizing them. A distinction should not be stigmatizing where it is most difficult to make the distinction required without reference to the characteristic giving rise to that distinction. Describing persons without documents as undocumented or illegal does not constitute paternalistic stereotyping which relegates those described to inferiority. *See generally Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 360, 98 S.Ct. 2733, 2784, 57 L.Ed.2d 750 (1978) (Brennan, White, Marshall & Blackmun, JJ., concurring in judgment in part and dissenting). Otherwise, any classificatory scheme which describes persons in an undesirable way would be suspect, leaving governments restrained in their ability to regulate.

▮ Focus on the *Carolene Products*[41] rationale, suggests that undocumented aliens are a class needing protection from the majority and the political process. The political process has made insufficient efforts to exclude undocumented persons from the country and while they are here the majority is quite willing to exploit them for their cheap labor. Additionally, the concerns of state governments normally are not related to the alienage or legal status of residents. *See, e. g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). State authority to classify based on a person's status as a citizen is confined within "narrow limits." *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). Accordingly, the normal deference given state legislation over matters which are the usual subjects of state legislation is not justified when state classifications are based on citizenship, or when no special attribute of citizenship is relevant.[42] Nonetheless, the court concludes that undocumented aliens are not a suspect class.

▮ The guarantee of equal protection is a restraint on the federal government as well as state governmental power.[43] There is little question that the federal government can treat undocumented aliens differently from citizens or resident aliens. The Supreme Court explained in *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), that the federal government could make legitimate distinctions between citizens and resident aliens because of the governmental interest in regulating immigration. The courts have not required the federal government to show that the distinctions they make are precisely tailored to the exercise of the power to regulate immigration and naturalization.[44] Rather, federally drawn distinc-

**41.** In *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), Justice Stone's now well known fourth footnote suggested that discrimination "against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."

**42.** In *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976) the Supreme Court stated that illegal entrants do not have "a colorable constitutional claim" to benefits provided to citizens by the federal government. The Court reasoned that the control of immigration and naturalization by Congress permitted flexibility in establishing the conditions of admission. This does not imply that the states have co-equal flexibility and can impose burdens on persons whom the federal government admits or permits to remain in this country. States may exclude aliens from offices of functions to protect the basic concept of a political community. *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973).

**43.** The Supreme Court has construed the due process clause as requiring equal protection of the laws. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The application of the guarantee of equal protection, however, differs when classifications are created by the state and federal governments. Thus,

The federal sovereign, like the State, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis, see *Buckley v. Valeo,* 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659] (1976), the Court of Appeals correctly stated that the two protections are not always coextensive. Not only does the language of the two Amendments differ, but more importantly there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State. On the other hand, when a federal rule is applicable only to a limited territory, such as the District of Columbia, or an insular possession, and when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause.
*Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976).

**44.** Judicial deference to federally created distinctions involving aliens is due in part to the political character of the immigration power. *See Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). This consideration does not render "federal power over aliens . . . so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." *Hampton v. Mow Sun Wong, supra,* 426 U.S. at 101, 96 S.Ct. at 1904.

tions between aliens and citizens are upheld where there is a legitimate basis for presuming that the distinction was actually intended to serve an overriding national interest. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976). Accordingly, as a matter of equal protection analysis, the federal power to regulate immigration is sufficient to justify federal discrimination against aliens. Further, the states' ability to make such distinctions where their interests are apparent suggests that the *Truax–Takahashi* rationale should control over the *Graham* Court's reliance on *Carolene Products*, at least when considering whether strict judicial solicitude should be extended to undocumented aliens.[45]

This does not imply that classifications involving undocumented aliens are permissible by their very nature or that the equal protection clause is inapplicable to a class of undocumented persons. Analogous decisions by the Supreme Court, the language of the fourteenth amendment, and holdings of other federal courts require that state classifications based on immigration status be subjected to judicial scrutiny.

Although the Supreme Court has never addressed squarely the applicability of the equal protection clause to undocumented aliens, decisions construing the fourteenth amendment do not suggest that the guarantee of equal protection is reserved to citizens or resident aliens. It is established that both the due process and equal protection clauses apply to resident documented aliens. *In re Griffiths*, 413

U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Comm'n.*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1891); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The Supreme Court stated in *Wong Wing* that the equal protection clause applied "to all persons within the territorial jurisdiction" of the United States, 163 U.S. at 238, 16 S.Ct. at 981. In *Yick Wo v. Hopkins, supra*, the Supreme Court stated that

The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

118 U.S. at 369, 6 S.Ct. at 1070. Inasmuch as undocumented aliens are protected by the due process clause, *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976), the court can conceive of no reason to conclude that they are unprotected by the equal protection clause.[46]

---

**45.** This conclusion is bolstered by the court's reading of *De Canas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). *De Canas* held that the exclusive federal power to regulate immigration did not pre–empt a California statute prohibiting employment of undocumented persons. Although *De Canas* did not involve the applicability of the equal protection clause to undocumented persons, "[t]he Court used equal protection terminology to find that protection of the state's lawfully resident labor force and economy were 'vital state interests,' and that the legislation was 'tailored to combat effectively the perceived evils.'" Note, 31 Stan.L.Rev. 1069, 1081 (1979). If the Court's findings were applied in an equal protection

context, they would refute the contention that a class of undocumented persons is suspect.

**46.** A student note has suggested that the applicability of the due process clause is not a basis to infer that undocumented aliens are protected by the equal protection clause.

Under due process of law certain individual rights are protected from unfair or mistaken deprivation by the state where minimum procedural safeguards are found lacking. Under equal protection of the laws individual rights are protected from arbitrary deprivation by the state where no legitimate state purpose is found to be adequately advanced thereby. The difference in focus between due process and equal protection inquiries demands cau-

The language of the amendment itself affords no basis for the proposition that undocumented aliens physically present within the state may not invoke the equal protection clause. Undocumented aliens, like other human beings, are "persons." The question, then, is whether an undocumented alien is a "person within the jurisdiction" of the state. The court concludes that the qualification "within the jurisdiction" of the state should be given its common, everyday meaning. Accordingly, undocumented children who reside in Texas and are subject to its laws are "within the jurisdiction" of Texas. Both the legislative history and the cases construing the qualification confirm this conclusion.

There is no indication that the framers of the fourteenth amendment intended to limit which individuals located within the United States were "persons" for either due process or equal protection purposes. In fact, one of the sponsors of the amendment said:

> The last two clauses of the first section of the amendment disables a State from depriving not merely a citizen but any person, whoever he may be, of life, liberty, or property without due process of law, or from denying to him the equal protection of the laws of the state. . . .
>
> . . . [I]t will, if adopted by the States, forever disable every one of them from passing laws trenching upon those fundamental rights and privileges which pertain to citizens of the United States, and to all persons who may happen to be within their jurisdiction.

71 Cong.Globe 2766 (May 23, 1866). In view of this legislative history which groups the two clauses, there is no reason to interpret "any person" under the due process clause different from "any person within its jurisdiction" under the equal protection clause.

This does not mean that the language is meaningless. It represents an inherent limitation on governmental power. In *Blake v. McClung*, 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1899), the Supreme Court held that a Virginia corporation was not a person within the jurisdiction of Tennessee. The Court noted that the equal protection clause

> manifestly relates only to denial by the state of equal protection to persons "within its jurisdiction." Observe that the prohibition against the deprivation of property without due process of law is not qualified by the words "within its jurisdiction," while those words are found in the succeeding clause relating to the equal protection of the laws. The Court cannot assume that those words were inserted without any object, nor is it at liberty to eliminate them from the Constitution and to interpret the clause in question as if they were not to be found in that instrument. Without attempting to state what is the full import of the

tion when extending equal protection guarantees through the vehicle of pre–existing due process rights, particularly when the courts are addressing the issue with regard to a group whose presence in this country is contrary to laws promulgated by the authority of the Constitution. Due process rights are afforded aliens to insure they are not deprived of interest in life, liberty or property without adequate procedural safeguards. Such constitutional guarantees do not automatically give rise to a like result for the protection of illegal aliens' entitlement to state benefits under equal protection of the laws.

Note, 11 St. Mary's L.J. 549, 562–63 (1979). It is doubtful that any court would extend equal protection guarantees "through the vehicle of pre–existing due process rights . . . ," nor suggest that the guarantees of due process "automatically give rise to . . . the protection of illegal aliens' entitlement to state benefits. . . ." Comparisons and distinctions between the two clauses should not be based on the rights that are safeguarded but on the persons protected by the amendment. The due process clause protects certain kinds of personal interests; those that inhere in the right to life, liberty, or property. The equal protection clause guarantees equal treatment by the government in the absence of sufficient justification. Neither the due process clause, strictly speaking, nor the equal protection clause creates substantive rights. It is illogical to argue that the rights protected by the due process clause should not determine which persons are protected by the equal protection clause. Analysis which focuses on the rights embraced by the two provisions sorely misapprehends the issue whether undocumented aliens are protected by the equal protection clause.

words, "within its jurisdiction," it is safe to say that a corporation not created by Tennessee, nor doing business there under conditions that subjected it to process issuing from the courts of Tennessee at the instance of suitors, is not, under the above clause of the Fourteenth Amendment, within the jurisdiction of that state.

*Id.* at 260–61, 19 S.Ct. at 173–174. To recognize the distinction, however, is not to register approval for discrimination against non–residents. Rather it is a recognition that

> Manifestly, the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities,–each responsible for its own laws establishing the rights and duties of persons within its borders.

*Missouri ex. rel. Gaines v. Canada,* 305 U.S. 337, 350, 59 S.Ct. 232, 236, 83 L.Ed. 208 (1939).

■ The reason for limiting the reach of state legislation is obvious: it necessarily is limited to objects within its jurisdiction.

> A most extraordinary condition would exist if the legislation of the states properly confined within its appropriate sphere were to be held invalid because it does not extend to and embrace objects beyond their jurisdiction. A legislative impasse would be created. Neither the nation nor the states could move forward; the former because power over matters purely of state concern is not conferred by the Constitution, and the latter because . . . they can effect none if they cannot effect equally all within and without their jurisdiction.

*Dolley v. Abilene Nat. Bank,* 179 F. 461, 463–64 (8th Cir. 1910), *aff'd,* 228 U.S. 1, 33 S.Ct. 409, 57 L.Ed. 707 (1913). Persons physically present within the state stand in such relation to the state to bring them "within its jurisdiction." Thus, the equal protection clause "does not prohibit legislation which is limited, either in the objects to which it is directed or by the territory within which it is to operate. It merely requires that *all persons subjected to such legislation* shall be treated alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed." *Magoun v. Illinois Trust & Savings Bank,* 170 U.S. 283, 293, 18 S.Ct. 594, 598, 42 L.Ed. 1037 (1898); *Hayes v. Missouri,* 120 U.S. 68, 71–72, 7 S.Ct. 350, 351–352, 30 L.Ed. 578 (1887). *See also Home Insurance Co. v. New York,* 134 U.S. 594, 10 S.Ct. 593, 33 L.Ed. 1025 (1890). The undocumented alien children are persons subjected to the legislation which is at issue in this action. They are physically present within the borders of Texas. *Shames v. State of Nebraska,* 323 F.Supp. 1321, 1333, 1338 (D.Neb.1971).[47]

Other federal courts already have held that the equal protection clause protects undocumented aliens. In *Bolanos v. Kiley,* 509 F.2d 1023, 1025 (2nd Cir. 1975), Judge Friendly stated: "We can readily agree that the due process and equal protection clauses of the Fourteenth Amendment apply to aliens within the United States . . . and even to aliens whose presence here is illegal." *Accord Holley v. Lavine,* 529 F.2d 1294 (2nd Cir.), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976); *United States v.Barbera,* 514 F.2d 294, 296 n.3 (2nd Cir. 1975); *Doe v. Plyler,* 458 F.Supp. 569, 579 (E.D.Tex.1978). *See also Hernandez v. Houston Ind. School Dist.,* 558 S.W.2d 121 (Tex.Civ.App.–Austin 1977, writ ref'd n. r. e.).

---

**47.** The equal protection clause may not prohibit discrimination against non–residents or against non–resident aliens. *See Zschernig v. Miller,* 389 U.S. 429, 459 n.26, 88 S.Ct. 664, 680 n.26, 19 L.Ed.2d 683 (1968) (Harlan, J., concurring); *Blake v. McClung,* 172 U.S. 239, 260–61,

19 S.Ct. 165, 173–174, 43 L.Ed. 432 (1899). Such discrimination, however, may be unconstitutional because of other constitutional principles, such as the privileges and immunities clause, the power to regulate interstate commerce, and the foreign relations power.

■ Accordingly, the equal protection clause protects undocumented aliens because they are "persons within the jurisdiction" of the state. State discrimination against illegal aliens is not necessarily permissible, and when a fundamental right is infringed by that discrimination the state must provide a compelling justification.[48]

## 2. Exclusion of Undocumented Children on the Basis of Wealth

■ Within the plaintiff class there are many children who are unable to attend school because they cannot afford the tuition. Section 21.031 does not provide for tuition, but the State has authorized the admission of undocumented children upon the payment of tuition.[49] The statute discriminates against children on the basis of wealth because it excludes children who cannot afford the tuition imposed.[50] In *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 25 n.60, 93 S.Ct. 1278, 1292, n.60, 36 L.Ed.2d 16 (1973), the Supreme Court stated that

> If elementary and secondary education were made available by the State only to those able to pay a tuition assessed against each pupil, there would be a clearly defined class of "poor" people— definable in terms of their inability to pay the prescribed sum—who would be

absolutely precluded from receiving an education. That case would present a far more compelling set of circumstances for judicial assistance than the case before us today.

That set of circumstances is presented by this case.

Several of the named plaintiffs in these actions have been prevented from attending the public schools because they could not afford tuition. In addition, there is no evidence of any children being admitted to public schools in those districts which condition admission upon the receipt of tuition.[51] This is not surprising. The evidence is quite clear that the parents of undocumented children are, for the most part, indigent. A study of the income characteristics of parents of undocumented children in the Houston area found that their mean hourly wage was $4.17.[52] Another study conducted in 1978 found that the mean hourly wage for undocumented persons was $2.75.[53] The U. S. Civil Rights Commission has stated that: "The situation in South Texas for the undocumented person . . . resembles the early slavery in the United States."[54]

It is worth noting at this point that undocumented aliens contribute to government revenues to the same extent as others with similar income. Nearly all of the recent studies which discuss the contribu-

---

48. A recent interpretation of a civil rights statute supports the proposition that the equal protection clause protects undocumented aliens. In *United States v. Otherson*, 480 F.Supp. 1369 (S.D.Cal.1979), four United States Border Patrol Agents were prosecuted for allegedly mistreating and assaulting several undocumented aliens. The court held that the undocumented aliens were "inhabitant[s] of any State, Territory, or District" within the meaning of 18 U.S.C. § 242. The court reasoned that the term "inhabitants" is synonymous with the expression "any person within the jurisdiction." A detailed review of the legislative history of the Reconstruction civil rights statute and the fourteenth amendment reveals that Congress intended to protect the civil rights of any person within the United States. It would be incongruous for an undocumented alien to be protected by a civil rights statute based on the equal protection guarantees of the fourteenth amendment, and yet not be covered by the

protections guaranteed by the clause itself. *Otherson* along with the court's conclusion that undocumented aliens are protected by the equal protection clause is ample justification for maintaining these consolidated cases pursuant to 42 U.S.C. §§ 1981 & 1983 and 28 U.S.C. § 1343(3).

49. Defendants' Exhibit No. 6–1 at 4; Plaintiffs' Exhibit No. 12 at 38.

50. *See* Plaintiffs' Exhibit No. 448.

51. Plaintiffs' Exhibit No. 448.

52. Plaintiffs' Exhibit No. 207 at 70.

53. Plaintiffs' Exhibit No. 210 at 35.

54. Plaintiffs' Exhibit No. 12 at 25.

tions of undocumented aliens to local, state and federal tax bases strongly suggest that this group pays more into the tax structure than they take out through social services. Due largely to their clandestine existence and the fear of being apprehended, undocumented aliens are one of the least likely groups to apply for social services. The public school education in Texas is financed primarily through sales taxes and *ad valorem* property taxes. Undocumented aliens are unable to escape the payment of those taxes; they buy consumer goods and they indirectly contribute property tax revenue through the payment of rent.[55]

The Supreme Court decisions concerning discrimination on the basis of wealth give special solicitude to indigents when two conditions are present. First, there must be a distinct class of disadvantaged poor who are absolutely deprived of access to a state benefit or service. Second, the state benefit or service must not be within the "area of economics and social welfare." *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973). Both of these conditions are satisfied in this case. The class of undocumented children excluded by the tuition requirement is "definable in terms of their inability to pay the prescribed sum . . . ." *Rodriguez, supra*, 411 U.S. at 25 n.60, 93 S.Ct. at 1292 n.60. This is not a question of absolute equality or precisely equal advantages. The argument here is that the lack of personal resources occasioned an absolute deprivation of the desired benefit.

It has already been noted that education cannot be considered a social or economic program.[56] Rather, "education is perhaps the most important function of the state

and local government." *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Examination of those cases in which the Supreme Court has held that wealth based classifications were unconstitutional reveals that the personal and social interests deserving of protection were similar to education. Conversely, in those cases in which the absolute denial of an interest did not compel special solicitude, the interests were dissimilar from education.

The Supreme Court has employed strict scrutiny when considering laws limiting access to the franchise and to the state criminal justice system. In *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Supreme Court held that a state poll tax was inconsistent with the equal protection clause. The Court stated that since "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process," the poll tax was based on "a capricious or irrelevant factor." 383 U.S. at 668, 86 S.Ct. at 1082. In *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court held that the Texas filing–fee requirement for primary elections was impermissible. Access to the ballot, like access to the schools, is controlled by the state and there is no alternative reasonably available.[57] Both voting and education are central to the concept of Jeffersonian democracy. Allowing qualified persons to vote and children to attend schools does not redistribute wealth or equalize the benefits available in our society. They both enable, however, persons to participate and to integrate into the social and political structure.

---

**55.** Record, Vol. I, 80–83; Vol. III, 431–32; Vol. XXII, 111–17. *See also* Plaintiffs' Exhibit No. 207 at 6–7. The Supreme Court has recognized that "aliens, like citizens, must pay federal taxes. . . ." *Mathews v. Diaz*, 426 U.S. 67, 83 n.22, 96 S.Ct. 1883, 1893 n.2, 48 L.Ed.2d 478 (1976). Thus, the assertion that undocumented persons should pay tuition to contribute their share of the costs of education is nonsense. *See Graham v. Richardson*, 403 U.S. 365, 376, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971) ("There can be no 'special public interest' in

tax revenues to which aliens have contributed on an equal basis with the residents of the state.")

**56.** *See supra* 562 563.

**57.** Although the state does not monopolize education, it is no answer that those who cannot afford the tuition imposed by the public schools can turn to the private schools. *See supra* at 560 561.

Cases involving the issue of equal justice for the poor parallel this case in that the state law created an absolute deprivation. In *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), the Court considered a state law which prevented an indigent criminal defendant from obtaining a transcript for use on appeal. There was no adequate substitute for stenographic transcripts. The Court noted that the ability to pay bears no rational relationship to guilt or innocence, 351 U.S. at 17, 76 S.Ct. at 589 and held the state law unconstitutional. Similarly, in *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), the Court held that defendants who could not pay for counsel from their own resources and who had no other way of gaining representation on direct appeals were denied equal protection of the law.

■■■ Equal protection does not imply the abolition of differences created by wealth. Enabling a person to have access to a necessary service or program neither assures him the same access which others have nor requires that any burden imposed be proportioned to his individual circumstances. Thus, *Douglas* does not stand for the proposition that indigents must be provided with the best lawyers. This principle is best illustrated by *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), and *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971). In *Williams v. Illinois* the Court held that a person could not be imprisoned because he was unable to pay a fine. In *Tate v. Short* the Court stated that

> the same constitutional defect condemned in *Williams* also inheres in jailing an indigent for failing to make immediate payment of any fine, whether or not the fine is accompanied by a jail term and whether or not the jail term of the indigent extends beyond the maximum term that may be imposed on a person willing and able to pay a fine. In each case, the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.

401 U.S. at 398, 91 S.Ct. at 671, *quoting, Morris v. Schoonfield*, 399 U.S. 508, 509, 90 S.Ct. 2232, 2233, 26 L.Ed.2d 773 (1970) (per curiam). The equal protection clause does not require "that fines must be structured to reflect each person's ability to pay in order to avoid disproportionate burdens." *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 22, 93 S.Ct. 1278, 1290, 36 L.Ed.2d 16 (1973). Like *Williams* and *Tate*, the undocumented children do not claim that the burden is heavier because of their indigency. They are prevented from attending school because they are unable to pay.

In cases after *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Supreme Court has carefully scrutinized statutes which would not have burdened indigents but for their complete inability to pay. In a case like *Rodriguez*, the circumstances are quite different. The plaintiffs in that case claimed that they received a poorer quality education because they were less wealthy. The states are not required to insure absolute equality which exists only hypothetically. On the other hand, absent sufficient justification, states may not permit some persons to benefit from certain state services and to be free from certain burdens while others are barred completely because they cannot pay.

The form of "wealth discrimination" upheld in *Rodriguez* is not encountered in this case. Accordingly, the court concludes that a state law which operates to deprive absolutely children of education when they are indigent should be scrutinized with care.

### 3. *Innocent Children*

Section 21.031 penalizes children because of acts committed by their parents.[58] In *Doe v. Plyler*, 458 F.Supp. 569 (E.D.Tex. 1978), Judge Justice stated:

---

**58.** Illegal entry is a misdemeanor for the first commission and a felony for subsequent commissions. 8 U.S.C. § 1325. The entry of a deported alien is a felony. 8 U.S.C. § 1326.

A more exacting scrutiny of the Texas law also appears warranted when consideration is given to the decisions of the Supreme Court refusing to penalize and stigmatize children who are not in a position to prevent the wrongful acts of their parents. As Mr. Justice Powell said of laws disfavoring illegitimate children:

> [V]isiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.

*Weber v. Aetna Casualty and Surety Company*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972) (footnote omitted). *See also St. Ann v. Palisi*, 495 F.2d 423, 425 (5th Cir. 1974) (invalidating school board's decision to suspend two children from the school because their mother had assaulted an assistant principal, on the ground that "[f]reedom from punishment in the absence of *personal* guilt is a fundamental concept in the American scheme of justice"). While the undocumented minor plaintiffs are of course legally culpable and subject to deportation, they can hardly be held morally responsible for their presence here. Many of them were hardly more than infants when they arrived in the United States, nor did they participate in their parents' decision to emigrate; consequently they deserve no additional burdens or penalties.

*Id.* at 582. The court finds that this analysis is supported by the evidence received in this proceeding.

Undocumented children do not enter the United States unaccompanied by their parents. Like other young children, they seldom have the power to choose their place of residence. For example, the court heard testimony from a young girl who entered the United States when she was five months old. Although the girl's father is a United States citizen and the child's mother is a documented resident alien, the child has no documents. She is, of course, documentable. Nonetheless, due to her difficulty receiving her Mexican birth certificate, she remained undocumented and was excluded from school. The young girl previously had attended school in New Jersey and Missouri. Her eight year old brother was born in the United States and attends school.[59] There also was testimony from another undocumented child who has siblings who were born in the United States and thus are citizens.[60] Any argument that the family should be treated as a unit when moral culpability is assessed is undercut by these facts. Those who were born a few years prior to the unlawful entry are no more responsible for it than those born shortly afterwards.

Cases involving classifications which punish children for acts committed by their parents are not subject to strict judicial scrutiny. They nevertheless are invalid if they are not substantially related to permissible state interests. *Lalli v. Lalli*, 439 U.S. 259, 264, 99 S.Ct. 518, 522, 58 L.Ed.2d 503 (1979). This formulation of the rational basis test will not accept any conceivable justification for a statute. The legislative means as well as the ends are subject to examination.

## 4. National Origin

It is suggested that section 21.031 is part and parcel of an historical pattern of discrimination against Hispanics in Texas. It is argued that Mexican–Americans residing in Texas will perceive excluding undocumented aliens from school as more discrimination against Hispanic people. Suffice it to say, the court concludes that there has been invidious discrimination in Texas against persons on account of their national origin. There has also been discrimination against persons on account of their illegal presence in this country. The statute, however, creates a classification based loosely

---

**59.** Record, Vol. VII, 1–33; Plaintiffs' Exhibits 272 & 273.

**60.** Record, Vol. VII, 49–50.

on immigration status, not national origin. State legislation discriminating against a class of undocumented persons is permissible if it is sufficiently justified. The amount of justification required should not vary depending on the citizenship of an undocumented person. It also should not be dependent on the history within a particular state regarding discrimination against citizens of a particular national origin. Thus, a state which never has discriminated against Mexican–Americans bears no lesser burden of justification for discrimination against Mexican undocumented persons. Conversely, the court concludes that the State of Texas could not pass legislation which would be invalid as to Mexican citizens, but valid as to other aliens. The court cannot condemn section 21.031 on the basis of *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Although the State generally monitors compliance with the section by examining the immigration status or citizenship of Spanish–surnamed persons, there is no evidence that non–Hispanic aliens are intentionally treated differently.

### C. State Rationale For Section 21.031

In defense of its decision to exclude undocumented children from the public schools, the State presented evidence concerning (1) the number of undocumented children in Texas; (2) the financial impact of educating these children on state and local resources; and (3) the impact of educating undocumented children on the quality of education and on compliance with desegregation orders. The State contends that the equal protection clause does not apply to undocumented aliens and thus that discrimination against members of that class is permissible no matter how invidious. Nonetheless, the State offered evidence which it believes demonstrates that section 21.031 is supported by a rational basis.

At the outset, the evidence demonstrated that prior to the passage of the amendment to section 21.031 in 1975, the State never had attempted to determine the number of undocumented children attending Texas public schools, nor the impact of educating these children upon the school districts. The current Commissioner of the Texas Education Agency was the Deputy Commissioner at the time section 21.031 was enacted and he was then primarily responsible for its implementation. He testified that no one from the Texas Legislature contacted anyone at the Texas Education Agency prior to the amendment. No studies were conducted to determine the number of undocumented children throughout the state, or the fiscal impact of educating them. No one attempted to compare the amount of taxes paid by undocumented aliens with the cost of educating undocumented children.[61]

Since the law was amended, the State has done very little to monitor the implementation of the statute by the local school districts. There is no evidence that the State has ever determined the number of local school districts which are excluding undocumented children, the number of school districts that charge tuition, or the number of school districts that provide tuition–free education to all children within their jurisdiction. Because this basic information has not been gathered, no effort has been made to determine the number of children actually affected by section 21.031. There is no data which show that the academic performance of students has improved since undocumented children were excluded.[62]

Indeed, the evidence in this case indicates that the State has been concerned primarily with the impact and number of documented Mexican children. With the exception of a study commissioned in connection with this case, the State–sponsored studies have concentrated on the characteristics and number of documented immigrant children. The studies have shown a steadily increasing number of immigrant children, primarily in the border areas. In addition, the studies indicate that most of the children require bilingual education and that the influx of

---

**61.** Record, Vol. XI, 1272–73, 1281, 1285; Plaintiff–Intervenor's Exhibit No. 3 at 259–60.

**62.** Record, Vol. XI, 1274.

these children has created a problem in the border districts that have limited space to house new students.[63] Funds provided to the local school districts by the State may not be used for construction [64] and districts with relatively small amounts of taxable property and growing student populations have difficulty financing new structures. This problem, however, is not shared by school districts with decreasing student populations and adequate taxable property.

The current conditions afflicting some border school districts result in part from the influx of documented aliens. These new residents offset the decline in school age population which is being experienced elsewhere in the State. Border school districts are not in danger of being affected by undocumented children who reside in Mexico attending the public schools in Texas. In 1977, the Texas Legislature amended section 21.031 by adding subsection (d) which requires a child not living with a parent or guardian to establish that "his presence in the school district is not for the primary purpose of attending the public free schools." This provision was designed in part to prohibit children whose parents reside in Mexico from being able to establish residence in the United States by living with another family.[65]

1. *The Number of Undocumented Children in Texas*

The State's assumption concerning the potential impact of undocumented children on the public schools is based on an estimate of the number of undocumented children presently residing in Texas. It must be emphasized that only the current figure is of concern; no evidence was offered which

implied that the number of undocumented children living in Texas and attending the schools in 1975 had an impact on public education. Thus, the State does not argue that the number was so great in 1975 that it was necessary to exclude undocumented children, but that once they had been excluded there are too many to include them once again.[66]

In preparation for the trial of this case the State attempted to calculate the number of undocumented children residing in the State. Experts in the area are in general agreement that there is no indisputable or acceptable estimate of the undocumented alien population in the United States, much less the number of undocumented alien children.[67] This is not surprising given the difficult methodological problems inherent in attempting to enumerate a clandestine population. It is in this context that the State's estimate must be analyzed.

The State's study was conducted by Mark Flolid, an employee of the Dallas firm, Criterion Analysis. His study (the Criterion Study) [68] attempted to estimate the potential number of undocumented children residing in Texas. The first step was to calculate the "documented Hispanic school age population." Assuming that only documented Hispanics are in the school system, Criterion obtained their documented "figure" by totalling the Hispanic students in public schools, private schools, and those reported as "school leavers." In the second step, Criterion subtracted the "documented" Hispanic school age population from the census figure for all Hispanics in Texas aged five to seventeen. The residual obtained was called the "potential undocumented Hispanic school age population."

---

**63.** Plaintiff–Intervenor's Exhibit 3 at 245–49. The testimony of Mr. Raul Besteiro, the Superintendent of such a border school district, testified that the problems his school district is experiencing are the result of an influx of documented children. Under the current system of financing education in Texas, his district is having trouble providing sufficient classroom space.

**64.** Tex.Educ.Code Ann. § 16.004 (Vernon 1979); Record, Vol. XII, 2062–67.

**65.** Record, Vol. X, 1217. *See Arredondo v. Brockette*, 482 F.Supp. 212 (S.D.Tex.1979).

**66.** As noted above, some school districts did not knowingly admit undocumented children prior to 1975. Plaintiffs' Exhibit No. 448.

**67.** Record, Vol. XXI, 86; Vol. III, 471.

**68.** *See* Defendants' Exhibit No. 2–1.

Criterion attempted to verify the assumption that the residual represented undocumented children by applying the same methodology to the total school age population of all races. Because the residual for all races was not substantially larger than the residual for Hispanics, Criterion concluded that the methodology in fact calculated undocumented children.[69]

The major shortcoming of this analysis is that it is actually an estimate of the number of children not enrolled in school, rather than of undocumented children. To assume that children not enrolled in school are undocumented is simply unsound.[70] Two aspects of this study demonstrate the error of this assumption. First, under the methodology used in the Criterion study, the residual "potential undocumented" Hispanic population in 1970 is found to be 80,115.[71] As most school districts admitted undocumented children prior to 1975, there is no basis for concluding that the children not enrolled in school in 1970 were undocumented; the 80,000 Hispanic children purportedly out of school are just as likely to be documented as undocumented. Moreover, the analysis inexplicably does not demonstrate any dramatic increase of Hispanic children not enrolled in school after implementation of the exclusionary statute.[72] Thus, the analysis demonstrates no correlation with what one would logically expect to be the pattern caused by the implementation of section 21.031 in 1975.

Second, the study uses two different data bases resulting in an inflated estimate of the number of Hispanics out of school. The 1970 census estimate of total enrollment in Texas public schools for all races is comparable to the TEA figure. However, when broken down ethnically, the census count shows more Hispanics enrolled and fewer blacks and whites than do the TEA data.[73] This discrepancy in the count of Hispanics between the census and the TEA data is probably due to the use of a more limited Hispanic identifier by TEA.[74]

Inasmuch as the study subtracted the TEA data, with its lower estimate of Hispanics, from the census data, with its higher estimate, to determine the number of undocumented children, the figure was necessarily high.[75]

The unsoundness and unreliability of Criterion's methodology is further demonstrated when one applies the major assumption of the study to the blacks and whites in Texas. Analysis of either census enrollment data, or of adjusted TEA data, results in the rather bizarre and untenable conclusion that there are at least 100,000 undocumented black and white children in Texas.[76]

---

**69.** See Record, Vol. XIII, 2297–98. See also Plaintiffs' Exhibit No. 419 which shows an undocumented population in 1980 for all races of 128,340 while Defendants' Exhibit No. 2–1 shows an undocumented Hispanic population in 1980 of 111,284.

**70.** Record, Vol. XXI, 56, 87, 95, 102–03, 136.

**71.** Plaintiffs' Exhibit No. 443. This result in and of itself is illogical because application of Criterion's methodology for all races obtains a residual of only 71,004. It is rather absurd to have an Hispanic residual greater than the combined residual of Hispanics, whites and blacks.

**72.** This is a result of the methodology used. In 1970 the study used two independent data bases: one for the census population aged five to 17; and one for TEA enrollment data. After 1970, however, the Criterion study simply increased the census population in the same proportion to the increases found in annual TEA enrollment data. Record, Vol. XVII, 97. This

necessarily resulted in preserving the same pattern of "residual" difference that existed in 1970 through 1980. Record, Vol. XXI, 93–94. Thus, the number of "potential undocumented children" simply increases in proportion to the increases in public school enrollment.

**73.** See Record, Vol. XXI, 64; Plaintiffs' Exhibit No. 441.

**74.** Record, Vol. XXI, 66, 131, 134.

**75.** Record, Vol. XVI, 65, 69.

**76.** Record, Vol. XXI, 72, 102–03, 136. Plaintiffs' Exhibit No. 442 uses census enrollment data and shows that 101,685 Hispanics, 183,215 Anglos, and 55,969 Blacks are out of school. Plaintiffs' Exhibit No. 443 adjusts TEA data to exclude students 18 and over to make it more comparable with the census data. This analysis yields an Hispanic residual of 119,884 and a Black and Anglo residual of 94,499.

Even if one accepts the flawed assumption at the heart of the study, four additional problems result in the inflated estimate of the number of undocumented children in Texas. First, Criterion's analysis of school leavers assumed that children under seventeen who dropped out would re–enroll because of state compulsory attendance laws. TEA's own report on school leavers, however, defines a school leaver as someone who "left school prior to graduation and to the best of the district's knowledge will not enroll in another school." Under Criterion's analysis, documented school–age children who leave school and do not return are counted in the residual "potential undocumented" children.[77]

Second, the study neglected to take into account the documented five and six year olds who have not yet enrolled in school. A breakdown by age and census data shows that most of the children not enrolled in school for each ethnic group are five or six years old. This error would accordingly reduce the number of "potential undocumented" school children by at least one half. The study used two independent data bases which did not measure children in the same age brackets. The census data covered only ages five to seventeen, while TEA enrollment data include children over and under these age groups.[78]

Third, the study ignored the census overcount of Hispanic children. When census and TEA data are mixed without making necessary adjustments for cross biases found in these two independent data sources, unreliable figures are a result. An expert in census data on Hispanics testified that the Criterion study was "not . . . done by a person who clearly understands the census data."[79] When comparing census with TEA data, census enrollment data

demonstrate that the census had higher enrollment estimates than TEA for Hispanics and lower estimates than TEA for whites and blacks. The validity of the study is founded on the lack of residual populations for blacks and whites. This is a result of the cross biases found in the two data bases, and when efforts are made to compensate for the cross biases the foundation crumbles.[80] *See* note 76 *supra.*

Finally, while attempting to estimate "potential undocumented children," the Criterion study is really an estimate of the children not in school. Reliance on school district enrollment data suggests that it may not even be a good estimate of that statistic. One State witness testified that in one particular year the enrollment data for the Houston Independent School District were in error by a factor of twenty–two percent.[81] If this is typical, the Criterion study "would be meaningless . . . [because] the error on the components used to arrive at the measurement would be larger than the measurement itself."[82] The court finds that the Criterion study does not represent an accurate estimate of the number of undocumented children in Texas.

The study by no means suggests that the estimates made by the demographers who have been studying this question for years should be rejected. Dr. Jorge Bustamante, considered the foremost authority on estimating the numbers of undocumented Mexican nationals in the United States, testified that he calculated the number of undocumented Mexican school age children in Texas to be approximately 20,000. This estimate is much more in line with the numerous studies which have been done by other demographers and social scientists attempt-

---

**77.** Record, Vol. XX, 31; Vol. XVIII, 39. Plaintiffs' Exhibit No. 420 at 30.

**78.** See Record, Vol. XXI, 101; Vol. XXI, 72–78. Plaintiffs' Exhibits No. 400, 418 & 442.

**79.** Record, Vol. XXI, 56. This may be because the person who conducted the study was not a demographer. Record, Vol. XVII, 82.

**80.** The court does not suggest that anyone knows which data base is accurate. It is noteworthy that the two surveys defined "Hispanics" differently. Record, Vol. XXI, 66–68. It is therefore not surprising that they resulted in different estimates.

**81.** Record, Vol. XVIII, 177.

**82.** Record, Vol. XXI, 115.

ing to assess the numbers and characteristics of undocumented Mexican nationals present in the United States.[83]

■■■■ The final element to the question of numbers is the State's argument that providing education to undocumented children would serve as an inducement for more undocumented persons to cross the border. The State's position strongly suggests that one of the bases for the statute is a desire to slow the flow of illegal immigration.[84] Such a basis for the statute is impermissible. Measures intended to increase or decrease immigration, whether legal or illegal, are the province of the federal government. In *DeCanas v. Bica*, 424 U.S. 351, 354, 96 S.Ct. 933, 936, 47 L.Ed.2d 43 (1976), the Supreme Court stated that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." Insofar as the State's rationale is to limit the inducements to immigration, the State statute is not based on a permissible state interest.

In addition, the evidence demonstrates that undocumented persons do not immigrate in search for a free public education. Virtually all of the undocumented persons who come into this country seek employment opportunities and not educational benefits. The State has conceded that the availability of jobs is the major factor which brings undocumented aliens into the United States. There was overwhelming evidence of the primacy of employment as the major attraction for immigrants.[85] and of the unimportance of public education as a stimulus for immigration.[86] Further, it is well understood that other social services in this State are neither available to or sought by undocumented persons. The unavailability of those services has not been shown to have stemmed the tide of illegal immigration. Undocumented persons do not come to Texas with a vision of America as an edenic welfare state; they come here to work. Finally, no other state has a statute excluding undocumented persons from the public schools.[87] There is no evidence that other states have a disproportionate num-

**83.** Record, Vol. III, 421, 461–63. *See also* Plaintiffs' Exhibit No. 438 at 142–43 (Villalpando Study – Only 160 undocumented children in the entire San Diego School District in 1975–76); Plaintiffs' Exhibit No. 209 at 25–26 (Cornelius Study – only one out of eight undocumented Mexican nationals reside permanently in the United States with median length of stay being 5.5 months); Plaintiffs' Exhibit No. 455 at 38 (Cornelius – of those who stay, only 29 percent have school age children with them); Defendants' Exhibit 17–3 at 89; (Van Arsdol Study – of those undocumented Mexican nationals who reside permanently in the United States, only 21 percent have school age children); Defendants' Exhibit 14–18 at 147 (North Study—of the total undocumented immigrants in the United States, i.e., flow and stock, only 3.7 percent had children in school); Defendants' Exhibit No. 14–19 at 10–11; (U. S. Comptroller General Study—of all undocumented people interviewed only 1.6 percent had undocumented children enrolled in schools). The court notes that the number of children whose parents are undocumented may be substantially greater. The Van Arsdol and the North studies include children who are citizens; the study conducted by the U. S. Comptroller General shows that 6.6 percent of the undocumented population have children in schools if documented, citizen, and undocumented children are counted.

**84.** The legislative history of the 1977 amendment to section 21.031 implies that the State intended section 21.031(d) to decrease illegal migration. The sponsor of the subsection stated that its restrictions would serve "to make it more difficult for kids to be brought in from Mexico to attend schools in the United States." Education Committee meeting, hearing on HB 247 (SB 425), March 25, 1977. It is not unlikely that similar concerns prevailed in 1975.

**85.** Record, Vol. III, 424, 427–28; Vol. V, 655; Vol. VI, 35.

**86.** Record, Vol. I, 104–05; Vol. III, 427–28.

**87.** The State has suggested that the California statutes, Cal.Educ. § 42800, *et seq.*, inhibit aliens from enrolling in the public schools. Prior to July 1, 1978, section 42911 required the superintendent of public instruction to adopt rules and regulations requiring county superintendents to list undocumented children by name and address and submit the list to the board of supervisors. In turn, the board was required to forward the list to the Immigration and Naturalization Service. That law was amended in 1977 and California public schools are not currently required to notify immigration authorities when undocumented children are enrolled in the public schools.

ber of undocumented persons who have been drawn to those states because of the availability of free public education. The court finds that free education would not serve as a significant attraction for undocumented persons.[88]

### 2. *Fiscal Impact*

The State contends that section 21.031 is supported by a rational basis because it saves money and preserves the State's resources; educating additional children would cost more and would spread the State's educational dollars too thinly. This, it is argued, would result in a decline in the quality of education in the State, or necessitate decreased funds for other social services. One employee of the Texas Education Agency used this analogy.

> If our total population can be compared to the people on an oceanliner and we are in a storm and the liner has gone down, and I am in charge of the life boat and the life boat holds . . . forty people, we already have fifty people on that boat, which is somewhat similar to the situation we have now because we have the capacity for so many kids, and we have a need for a greater capacity but don't have that capacity, but we still have the kids . . . there is (sic) still people out there in the water to be saved. Now if I make the decision, being in charge of that life boat, that I will pick up another one hundred people and sink that boat so that somebody is saved, would I be justified; or, conversely, do I allow some of those people out there in the water to drown so that I can save these fifty that I already have in the boat?
>
> . . . . We can stretch teachers so far to when we get to the point when the teachers can no longer adequately meet

the needs of these children, or when the teachers are so overburdened that they are going to quit teaching rather than put up with this sort of situation. Then I think our ship will go down.

> . . . . You have to determine those that you can save. You have to determine in our case here the number of children that you can provide adequate, or nearly adequate, education to and you have to in some way determine whether the introduction of an insignificant (sic) number of students for these same services would then depress the level to the point that none of these people would be adequately served.[89]

Without suggesting that this form of educational *triage* is ever justified, the court finds that the State has misstated the case. Permitting undocumented children to attend the public schools clearly would affect State and local resources. The evidence does not indicate, however, that the State or the school districts lack the necessary funds. Indeed, as counsel for the State noted in closing argument:

> There is no place in this pre–trial order that the State has said the State of Texas doesn't have enough money. Not one place. Texas can come up with the money. If we want to get the legislature to fund certain projects, we will go down and get them to fund it. The State never said it didn't have money in its budget.[90]

Without a reliable estimate of the number of undocumented children in the State, it is difficult to gauge the precise financial savings that can be expected to accrue as a result of excluding children from school pursuant to section 21.031. Nonetheless, the evidence indicates that both the State and the local school districts together have sufficient funds to educate the undocumented children.

---

**88.** If the State was genuinely interested in removing inducements for illegal immigration or in preserving public funds dedicated to education, a law sanctioning employers for hiring undocumented persons would do very nicely. Little support exists for such a measure.

**89.** Record, Vol. XVI, 3511, 3538–39. The court notes that this statement of the problem should

reflect that prior to 1975 the undocumented children were, for the most part, in the life boat. They have been thrown out and the State now claims it cannot afford to bring them back aboard.

**90.** Record, Vol. XXIV, 78–79.

Texas enjoys a healthy economy. As a result of economic growth throughout Texas, the State budget showed a closing balance on August 31, 1979, of $2.15 billion for funds that can be appropriated by the Legislature. This represents a 3.7 percent increase above the cash balance at the beginning of the year.[91] This is attributed to highly commendable fiscal policies which prohibit deficit spending. The court by no means wishes to disparage the concern for fiscal integrity. Nonetheless it must be noted that Texas ranks 42nd of the fifty states in current per pupil expenditure.[92] It is necessary to examine the way in which the State appropriates money for education in order to assess the claim that the expense of educating undocumented children is prohibitory.

The witnesses agreed that the bulk of the state budget is derived from consumer taxes, primarily the State's sales tax. Revenues raised by the State are placed in various funds. Monies for education primarily come from the General Revenue Fund, the Omnibus Tax Clearance Fund, the Highway Motor Fuel and Tax Funds, and the Permanent Escrow Fund.[93] Each one of these funds had a net cash balance (surplus) as of August 31, 1979, the end of the last fiscal year. The General Revenue Fund has had a surplus for the last twelve years, and for at least three years that surplus has exceeded $600 million.[94] The current estimate by the Comptroller is that the General Revenue Fund will have a cash balance of $324.4 million at the end of the current biennium.[95] This projected surplus is sufficient to finance completely the education of all undocumented children in Texas even if the State correctly estimated the number of undocumented school age children. The Foundation School Program amounts to $1,200.00 per student calculated in terms of average cost per average daily attendance. Under current school finance laws, the State would be required to provide $800.00 per child to the school districts.[96] If the school finance laws were altered and the current state expenditures were provided to educate both the current number of school age children plus undocumented school age children, the addition of 120,000 undocumented children would decrease the State's per pupil expenditure by $70.00. As already noted, the State has grossly overestimated the number of undocumented children in Texas.

The impact of admitting undocumented children on the local independent school districts would not be uniform. It appears that the wealthy metropolitan school districts in which local funds support a larger percentage of the total educational cost and the poor school districts in which local dollars are stretched to the limit would be the most affected. These problems are very real. The conditions in Brownsville require the use of temporary buildings having no air conditioning. In districts like Dallas the high cost of living requires the school district to adopt a salary structure which exceeds that contemplated by the Foundation School Program. These difficulties are addressed by current school finance laws in only one respect. The school finance laws do not attempt to aid a district like Brownsville with its construction problems, and they do not attempt to compensate for the higher cost of living and of municipal

91. Plaintiffs' Exhibit No. 204 at 7.

92. Record, Vol. XXIII, 8–9; Plaintiffs' Exhibit No. 451.

93. Record, Vol. X, 1113; Vol. XIII, 2236–37; Plaintiffs' Exhibit No. 204 at 14–15. *See also* Plaintiffs' Exhibits 276–278 & 300 (for illustrative purposes).

94. Record, Vol. XX, 118–19.

95. Record, Vol. XXIII, 15 & 16; Vol. XIII, 2242. In recent history, the Comptroller's estimate is usually lower than the actual surplus. Record, Vol. XIII, 2252–53. This is not always the case.

96. Record, Vol. XIII, 2255, 2265 & 2268. The difference between $1,200.00 and $800.00 is accounted for by certain categorical funds which are appropriated as sum certains. Those monies are not part of the "regular program," but are used for programs such as compensatory, special and vocational education. *Id.* at 2244. Unlike regular program funds, categorical funds do not draw automatically on the General Revenue Fund.

government in the large cities.[97] Instead, the Legislature has attempted to ameliorate these conditions by reducing the number of students.

The State often stated during the hearing that Texas has the duty to protect the fiscal integrity of the local independent school districts. As Judge Justice noted in *Doe v. Plyler*, 458 F.Supp. 569, 589 (N.D.Tex.1978), "[a]ny spectator watching the state's presentation might easily have mistaken it for a retrial of the *Rodriguez* case, with the State of Texas acting as *amicus curiae* for the plaintiffs, emphasizing the plight of property–poor border school districts under the State's educational financing scheme." The Legislature's approach to alleviating overcrowding in the border school districts and to assist the metropolitan school districts with teacher salaries is a drastic one. It is to exclude children from the schools.

### 3. *Bilingual Education and Desegregation*

The State also presented evidence concerning the impact of educating undocumented children on bilingual education programs and on desegregation plans being implemented throughout the State. The evidence indicates that at the present time there is a shortage of qualified bilingual teachers in some school districts, and that educating an additional number of children with limited English speaking ability will further strain these resources. The court heard, however, a great deal of expert testimony describing methodologies and techniques available to offset the present shortage of bilingual teachers. Classroom management techniques have been utilized in other states when adequate numbers of bilingual teachers have been unavailable.[98] Accordingly, while there is no doubt that Texas school districts will encounter difficulty providing the current level of educa-

tional opportunity to all children with limited English speaking ability if a large number of children are added to the program, the court is not convinced that it was necessary to exclude an identifiable portion of the children of limited English speaking ability in order to protect the Mexican–American and documented alien children in the State.

Moreover, the evidence demonstrates that the largest single source of funds for bilingual education is the federal government. In 1977–78, the State appropriated approximately $6.9 million for the State bilingual program. The federal government provided grants of over $14 million pursuant to Title I of the Elementary and Secondary Education Act and the Emergency School Aid Act bilingual grants in the same year. This figure does not include funds provided through the Title I Migrant Program which also can be used for bilingual education. Texas receives more Title I Migrant funds than any other state in the nation.[99] Nothing in the federal statutes or regulations prohibits the use of federal funds for the education of undocumented children.[100]

The State also presented evidence purporting to show the adverse impact of an influx of undocumented children on compliance with desegregation orders. While conceivably the influx of undocumented children might affect the minority enrollment in some schools, there is nothing in desegregation orders which forbids modifications that enhance desegregation. As one desegregation expert testified, there is nothing in any desegregation order which could be interpreted in any way to prevent or to preclude a school system from enrolling children in the schools. Further, evidence shows no more than a hypothetical set of facts which only conceivably could affect desegregation. The State did not even at-

**97.** One witness stated: "For school districts like Dallas and Houston the foundation program is particularly discriminatory because it does not recognize the municipal overburden of the county, the hospital district, the water district, the city and other municipal services that must be delivered." Record, Vol. XIII, 2148.

**98.** Record, Vol. VIII, 170–80, 185–87; Vol. XXII, 28–30, 33–37.

**99.** Plaintiff–Intervenor's Exhibit No. 46; Record, Vol. IX, 1071–72.

**100.** Record, Vol. IX, 1046. *See* discussion *infra.*

tempt to show that compliance with desegregation orders would be made more difficult. The State's bald assertion is insufficient to provide even a conceivable basis for the statute.

### D. Application of Judicial Scrutiny

 Maintaining the fiscal integrity of the public schools is an important and legitimate state interest. *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969).[101] States have the responsibility of safeguarding all monies entrusted to them by the taxpayers and these demands are increased when a fundamental state function such as education is involved. That does not mean that any measure which saves money is constitutional. The court has concluded that the absolute deprivation of education should trigger strict judicial scrutiny, particularly when the absolute deprivation is the result of complete inability to pay for the desired benefit. When strict judicial scrutiny is appropriate, important or legitimate governmental interests are not sufficient to justify legislative classifications. The classifications, if they are to be upheld, must be shown to be necessary to promote a compelling governmental interest. *In re Griffiths* 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2852–2853, 37 L.Ed.2d 910 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7, 92 S.Ct. 1029, 1035 n.7, 31 L.Ed.2d 349 (1972); *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972); *Graham v.*

*Richardson*, 403 U.S. 365, 375–76, 91 S.Ct. 1848, 1853–1854, 29 L.Ed.2d 534 (1971); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969); *Kramer v. Union Free School District*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969); *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). Additionally, the factor which is the basis for differentiating between persons otherwise equal may not be capricious or irrelevant; it must be germane to the effectuation of the State's interest. *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 535–38, 93 S.Ct. 2821, 2826–2828, 37 L.Ed.2d 782 (1973); *Reed v. Reed*, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971); *Oregon v. Mitchell*, 400 U.S. 112, 243, 91 S.Ct. 260, 324, 27 L.Ed.2d 272 (1971) (Brennan, J., dissenting); *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970); *Walters v. City of St. Louis*, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1954). Finally, the State is required to show that there are no less restrictive alternatives available. *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972); *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). The State has not carried this heavy burden of justification.

First, the concern for fiscal integrity is not a compelling[102] state interest. *Graham v. Richardson*, 403 U.S. 365, 374–75, 91 S.Ct. 1848, 1853–1854, 29 L.Ed.2d 534 (1971);

---

**101.** The Supreme Court stated in *Shapiro v. Thompson*, 394 U.S. at 633, 89 S.Ct. at 1330 (1969), that

> We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. The State contends that undocumented children are not entitled to equal protection under the laws and that necessarily any discrimination against undocumented children is permissible even if that discrimination is founded on bad reasons or no reasons at all. Accordingly,

the State would read the Court's *dicta* in *Shapiro* with the emphasis on the word "citizens."

**102.** In discussing the test for strict scrutiny, the Supreme Court has stated:

> The state interest required has been characterized as "overriding" [*McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964)]; *Loving v. Virginia*, 388 U.S. 1, 11 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); "compelling," *Graham v. Richardson* [403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971)]; "important, *Dunn v. Blumstein*, 405 U.S. 330, 343 [92 S.Ct. 995, 1003, 31 L.Ed.2d 274] (1972), or "substantial," *ibid.* We attribute no particular significance to these variations in diction. *In Re Griffiths*, 413 U.S. 717, 722 n.9, 93 S.Ct. 2851, 2855 n.9, 37 L.Ed.2d 910 (1973).

*Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969).

Second, the State has not shown that excluding children from school is in any way necessary to the improvement of the education in the state. As the State argued in *Rodriguez,* there is no evidence that the quality of education is somehow strictly tied to the amount of money expended on each child. 411 U.S. at 24 n.56, 42–43 & n.86, 46 n.101, 93 S.Ct. at 1291 n.56, 1301–1302 & n.86, 1303 n.101. The State now wishes the court to assume without any credible supporting evidence that a proportionately small diminution of the funds spent on each child will have grave impact on the quality of education. Naturally, the court shares the State's concern for the quality of education. This memorandum should be ample evidence that this court believes that education is a critical state function. Barring the doors to a distinct group of children, however, is the most, not the least, drastic alternative available.

Third, the State has not shown that the classification used actually advances the state interest. The classification employed by the statute is, loosely speaking,[103] a function of federal immigration status. The undocumented children are otherwise similarly situated to the other children in the State. Nothing about their immigration status by itself distinguishes them from other children in terms of their educational needs.[104] The parents of undocumented children, along with other parents, finance

public education. The classification used is wholly irrelevant to the achievement of the State's objective. *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–1105, 6 L.Ed.2d 393 (1961). The exclusion of undocumented children no more relates to the saving of educational resources than does denying access to education to a similar number of documented and citizen children. The State never attempted to examine the impact of undocumented children on the schools before deciding to exclude them. It is thus not surprising that the classification used is in no way carefully tailored or drawn to advance the state interest.[105]

Equal protection of the laws is meaningless unless it applies to the unpopular as well as the popular, the weak as well as the strong. As the Supreme Court has stated:

> Equal protection of the laws is something more than an abstract right. It is a command which the state must respect, the benefits of which every person may demand. Not that the least merit of our constitutional system is that it safeguards extend to all—the least deserving as well as the most virtuous.

*Hill v. Texas,* 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942). The undocumented children residing in the State of Texas are entitled to that protection. Section 21.031 of the Texas Education Code does not employ a classification which is necessary or substantially related to a compelling governmental interest.[106] . According-

---

**103.** The children not "legally admitted" are those without documents. It is important to note that this is not equivalent to deportable. Many of the undocumented children are not deportable. None of the named plaintiffs is under an order of deportation. Immigration experts testified that it is most unusual for the Immigration and Naturalization Service to initiate deportation proceedings against children.

**104.** Like resident alien children, undocumented children are more likely to need bilingual education. Like resident alien children, many undocumented children do not need bilingual education. *Cf. Doe v. Plyler,* 458 F.Supp. at 589. Indeed, many undocumented children previously have attended schools in other states.

**105.** The court has concluded that an intensified rationality test is appropriate because the stat-

ute penalizes children in the absence of individual responsibility or wrongdoing. *Supra* at 572 573. Under that approach, the means used by the State must be substantially related to the achievement of the governmental objective. Here there is no relationship between the classification and the objective. It is wholly capricious and irrelevant. The statute cannot be upheld if intensified rationality is applied.

**106.** *See Hosier v. Evans,* 314 F.Supp. 316 (D.V. I.1970) (statute which excludes undocumented children from school violates the equal protection clause). *Cf. Hall v. St. Helena Parish School Bd.,* 197 F.Supp. 649 (E.D.La.1961), *aff'd,* 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1962) (a state statute which excludes children from school on the basis of their place of residence is irrational).

584

ingly, that statute violates the equal protection clause of the fourteenth amendment of the United States Constitution.

## III. PRE–EMPTION

 State legislation which improperly encroaches upon an area of federal responsibility or concern will be held invalid under the pre–emption doctrine. The pre–emption doctrine has two elements: state legislation is pre–empted if it regulates matters which are subject to exclusive federal legislative control[107] or if it conflicts with the effectuation of congressional objectives. Under the first formulation, congressional power should be deemed to "oust" state authority when "the nature of the regulated subject matter permits no other conclusion" or "[when] Congress has unmistakably so ordained." *DeCanas v. Bica*, 424 U.S. 351, 356, 96 S.Ct. 933, 937, 47 L.Ed.2d 43 (1976), *quoting, Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). In the second circumstance, when the federal legislation contemplates complimentary state legislation, state law will be held invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The issue before the court is whether Title I of the Elementary and Secondary Education Act of 1965 (Title I) pre–empts section 21.031 of the Texas Education Code. Title I does not reflect a congressional intent[108] to occupy or to oust the states from the field of education, and the nature of the subject matter certainly permits the contrary conclusion. Accordingly, the issue is whether section 21.031 burdens or conflicts with federal objectives. In order to determine whether such a burden or conflict exists, it is necessary to examine the objectives and statutory schemes of both legislative provisions.

There is no legislative history accompanying the 1975 amendment to section 21.031, yet it is possible to ascribe a governmental objective to the statute. The purpose of section 21.031 has been described as the protection of the fiscal integrity of state and local educational programs. The method used to save money is to reduce the number of students and in particular the number needing bilingual education. Although legislative history of a subsequent amendment to section 21.031 suggests that the Texas Legislature may have had other motives, *see* note 84 *supra*, the court will assume that the Legislature had no illicit purposes and that the statute was not intended to regulate a matter subject to exclusive federal power. Education is a matter of state and local concern under the police powers.

Title I, 20 U.S.C. § 2701 *et seq.* is the major program of federal aid for elementary and secondary schools. Briefly stated, Title I provides funds to state and local educational agencies for the development and implementation of compensatory programs designed to supplement the educa-

---

**107.** States are sometimes considered pre–empted from acting in areas subject to exclusive federal power. *See,* Comment, 16 Hou.L.Rev. 667, 693 (1979). Logically, however, federal power does not pre–empt the State from legislating in an area in which it has no power to legislate; exclusive federal power implies the lack of state authority. Thus, federal authority to control immigration or to conduct foreign policy does not pre–empt the State's authority regarding those matters. Accordingly, ". . . state attempts to regulate a field reserved to the federal government by the Constitution, such as interstate commerce, will be totally void of impact. This is not based on principles of pre–emption, however, and should not be so regarded. Generally, pre–emption implies the existence of federal legislation." R.

Katz & H. Lenard, Federal Pre–emption and the "Right" of Undocumented Alien Children to a Public Education: A Partial Reply, 6 Hastings Const.L.Q. 909, 913 (1979).

**108.** An examination of the legislative scheme utilized in Title I demonstrates that Congress did not intend to pre–empt state educational legislation. To the contrary, the legislation is drafted to allow the Secretary of Education, who is now responsible for administering the program and disbursing federal funds, to withhold funds from states which do not comply with Title I regulations. 20 U.S.C. §§ 2762, 2802 & 2836. *See* R. Katz & H. Lenard, *supra*, n.107, at 924–25.

tion provided to those children targeted by Congress as "educationally deprived." The declaration of policy found in Title I, 20 U.S.C. § 2701, states:

> In recognition of the special educational needs of children of low–income families and the impact that concentrations of low–income families have on the ability of local educational agencies to support adequate educational programs, the Congress hereby declares it to be the policy of the United States to provide financial assistance (as set forth in the following parts of this subchapter) to local educational agencies serving areas with concentrations of children from low–income families to expand and improve their educational programs by various means (including pre–school programs) which contribute particularly to meeting the special educational needs of educationally deprived children. Further, in recognition of the special educational needs of children of certain migrant parents, of Indian children and of handicapped, neglected, and delinquent children, the Congress hereby declares it to be the policy of the United States to provide financial assistance (as set forth in the following parts of this subchapter) to help meet the special educational needs of such children.

The Title I Migrant Program, 20 U.S.C. §§ 2761–2763, represents a congressional commitment to the establishment of a federal program designed to provide an element of continuity to the education of children whose parents are migratory agricultural workers.

> These children have often been called the most educationally deprived children in America. As the National Advisory Council on the Education of Disadvantaged Children has stated: "the migrant child is constantly moving; he has no continuity in his education or his life in general; he is in the largest group of non–English speaking children in the Title I program. He is out of the mainstream of any stable society and has few bases for security. His parents are in the fields all day, and in the formative years and later, he is either there, working with them, or at home babysitting with [the] younger children.

3 *U.S.Code Cong. & Admin.News,* pp. 4093, 4113 (1974).

The annual federal appropriation for Title I now exceeds $3 billion.[109] Ninety percent of the school districts in the country participate in the program; approximately six million children currently are being served. 5 *U.S.Code Cong. & Admin.News,* p. 4973 (1978). Of the various kinds of educational deprivation recognized under Title I, it is the impoverished child and the migrant child who rank first and second respectively in terms of the amount of money appropriated for each category. Participation in the program is entirely voluntary both on the part of the states and on the part of the school districts within the state. Since its enactment, however, there has been consistent participation by ninety percent of all school districts in the state.[110] Nothing in the law or its regulations distinguishes between documented and undocumented children.

The amount of money a state will receive upon application for Title I funds is computed through the use of the "Title I formula." 20 U.S.C. § 2711. Briefly, a state's allocation is determined by multiplying a percentage of the state's per pupil expenditure by the number of children residing in the state aged five through seventeen from families below the poverty level as counted in the 1970 census. According to the 1970 census, there are more "formula" or impoverished children residing in Texas than in any other state. Based upon their residence in the state, Texas has received $1.3 billion in general Title I revenue since the law was enacted.[111] Nearly one–half of that amount, almost $600 million, has been allocated to the State since fiscal year 1976

---

**109.** Record, Vol. IX, 1008.

**110.** *Id.* at 1019.

**111.** *Id.* at 1013, 1028.

and the enactment of section 21.031.[112] Undocumented children play an important role in the eventual allocation of Title I money to Texas. The Bureau of Census made every effort to count every individual residing within our national boundaries in the 1970 census.[113] It is apparent that substantial numbers of the "formula" children are in fact undocumented children.

In contrast to the general Title I program which utilized census statistics to determine the residency of poverty children for the purposes of federal funding, the Title I Migrant Program involves an ongoing effort to identify every eligible migrant child residing in the United States. Once an eligible migrant child is identified, he is given an identification number and is then enrolled in the migrant student record transfer system (MSRTS), and a computer record is maintained of every migrant child in the United States.[114] In accordance with the federal funding formula, the number of migrant children enrolled in the MSRTS and found to be residing in a state during a given year determines the amount of Title I Migrant Funds to be awarded to that state in the subsequent fiscal year.[115]

Texas, like other states participating in the Title I Migrant Program, is under a federal obligation to identify every eligible migrant child residing in the state and to enroll them in the MSRTS. 45 C.F.R. §§ 116d.10(b)(1), 116d.32(b) & 116.39(f). These children do not have to be enrolled in school to be identified and enrolled in the MSRTS so long as they meet the federal definition of a current or former migrant.

Federal regulations pertaining to the identification of migrant children are interpreted as a blanket prohibition against inquiring into the immigration status of either a child or his parent. 45 C.F.R. § 116d.12. There is no question that Texas enrolls undocumented children into the MSRTS.[116]

■ As a result of the ironic relationship between the two statutes, Texas receives money for education from the federal government because of the presence of children who are excluded from school. The children are targeted to benefit from federal funds supplementing their education when in fact they receive no education at all. Despite this windfall to the State, the court concludes that Title I does not preempt section 21.031.

■ Whether a state statute stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress requires two separate analyses. It must first be determined whether there is a specific conflict within the express provisions or the very terms of the two statutes. *California v. Zook*, 336 U.S. 725, 728, 69 S.Ct. 841, 842, 93 L.Ed. 1005 (1949); *Kelly v. Washington*, 302 U.S. 1, 4, 58 S.Ct. 87, 89, 82 L.Ed. 3 (1937). *See also DeCanas v. Bica*, 424 U.S. 351, 363–65, 96 S.Ct. 933, 940–41, 47 L.Ed.2d 43 (1976); *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 422, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973). There is no specific conflict between the state and federal programs; compliance with both the state and federal statutes is not a physical impossibility.

112. Defendants' Exhibit No. 6–2.

113. Record, Vol. IX, 375.

114. *Id.* at 1077.

115. For a detailed description of the formula utilized to determine a state's migrant education grant, *see*, appendix, November 13, 1978, Federal Register, Part 3, at 52686. Pursuant to the regulations, a migrant child is eligible to be enrolled in the MSRTS and to receive Title I Migrant services if he is either a "currently migratory child" or a "formerly migratory child." 45 C.F.R. § 116d.2. A currently migratory child is a child who has moved across school district boundaries within the past year

to enable the child's parent or guardian to obtain agricultural or fishing employment; a formerly migratory child is one who was considered currently migratory within the past six years. Record, Vol. IX, 1075–76.

116. Record, Vol. IX, 1093; Plaintiffs' Exhibit No. 249 at 25. Texas receives more Title I Migrant funds than any other state because more migrant children have been found to reside here. Of an annual national appropriation of almost a billion dollars, over one–fourth of that amount will be allotted to Texas. Undocumented children account for some of this money.

*Florida Avocado Growers v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). The State's actions are not in violation of any specific provision of Title I, and section 21.031, on its face, is not inconsistent with the federal statutes.

Second, the court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977). The salient feature of Title I is that it is designed to provide supplementary funds to local educational agencies. This major purpose is not one that cannot be accomplished unless all formula children attend schools. The financing scheme employed by Title I does not indicate that all formula children must benefit from supplementary funds. First, the census was used to compute the number of formula children despite criticism; it was simply the best count available. It continues to be used (along with some alternative formulas) even though there have been demographic shifts in the intervening decade. The children who were five to seventeen years old in 1970 were thirteen to twenty-five years old when the use of the census was reaffirmed in 1978. Many children counted in 1970 in the north had moved south by 1978. While this was recognized, Congress continued to use census data. Second, a child may be "formula eligible", yet consistent with the statute not benefit from supplementary funds. A local educational agency may "skip" certain schools with a large number of formula children to provide additional funds to schools with a greater number and higher percentage of low–income students. Looking at the statutory scheme as a whole, Title I does not pre–empt a state statute which prevents formula children from benefiting from the federal funds. For example, Title I does not pre–empt a state education program which omits kindergarten because five year olds are formula children. The court concludes that the use of the formula does not designate the children who should benefit from federal assistance, but rather the schools which contain significant numbers of educationally deprived students.

■ Finally, the voluntary nature of Title I militates against finding that section 21.031 is pre–empted. As noted above, the state has received over $600 million in Title I funds since the state statute was amended. The Commissioner of Education (now the Secretary of Education) has never indicated that Title I pre–empts state programs which are not perfectly consistent with the federal objectives. The Supreme Court reached a similar conclusion in *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

> Moreover, the Department of Health, Education and Welfare, the agency of Government responsible for administering the Federal Social Security Act—including reviewing state FTC programs—has never considered the WIN legislation to be pre–emptive. HEW has followed consistently the policy of approving state plans containing welfare work requirements so long as those requirements are not arbitrary or unreasonable. Congress presumably knew of this settled administrative policy at the time of enactment of WIN, when twenty–one states had welfare work programs. Subsequently to WIN's passage, HEW has continued to approve state work requirements. Pursuant to such approval, New York has received federal grants–in–aid for the operation of its AFDC plan, including its work provisions. In interpreting this statute, we must be mindful that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, [89 S.Ct. 1794, 1802, 23 L.Ed.2d 371] (1969); *Dandridge v. Williams*, 397 U.S. [471], at 481–482, [90 S.Ct. 1153, 1159–1160, 25 L.Ed.2d 491]. In this case, such indications are wholly absent.

*Id.* at 420–21, 93 S.Ct. at 2516. The quoted language from *Dublino* relates to the question of congressional pre–emptive intent. Nonetheless, it also suggests that a legisla-

tive program which provides for voluntary participation and administrative approval of state plans should not be found to be so inconsistent with state laws that both cannot stand. The Secretary of Education could withhold payments to TEA or require TEA to withhold or reduce payments to certain individual school districts. 20 U.S.C. § 2836(a).[117] If this action was taken, the operation of both statutory schemes could be reconciled with one another without holding the state scheme pre–empted.

*Cf. Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). In this instance, when an administrative framework exists, any conflict between the federal and state statutes should be resolved by cooperative federal–state resolution and not judicial decree. *See Dublino, supra,* 413 U.S. at 423 n.29, 93 S.Ct. at 2518 n.29. The court concludes that Title I of the Elementary and Secondary Education Act does not pre–empt section 21.031 of the Texas Education Code.[118]

117. The contrary position is best set forth in the dissent of Justice Marshall, joined by Justice Brennan, in *New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 430 n.9, 93 S.Ct. 2507, 2521 n.9, 37 L.Ed.2d 688 (1973).
It is unnecessary for me to discuss at any length the Court's analysis of the preemption problem. I note, as the court does, . . . that this case does not present the classic question of pre–emption, that is, does the enactment of a statute by Congress preclude state attempts to regulate the same subject? There is no question that New York may impose whatever work requirements it wishes, consistent only with constitutional limitation, when it gives public assistance solely from state funds. . . . The question here relates to the conditions that Congress has placed on state programs supported by federal funds. The distinction is not without importance, for it makes inapposite the strictures in our earlier cases and relied on by the court, against lightly interfering with state programs. For we must, of course, be cautious when we prevent a State from regulating in an area where, in the absence of congressional action, it has important interest. Holding that the Federal WIN Program is the exclusive method of imposing work requirements in conjunction with federally–funded programs of public assistance would have no such impact; New York would remain free to operate public assistance programs with state funds, with whatever work requirements it chose.
Even if this dissent was adopted by the Supreme Court, and administrative reconciliation was found not to be preferable to judicial application of the pre–emption doctrine, this case is distinguishable. The classic question of pre–emption also is not presented here. Title I is not a federal program which can exist independently of state educational programs. Section 21.031, however, was not promulgated as part of the implementation of the federal legislative scheme. *See id.* at 411 n.9, 93 S.Ct. at 2512 n.9 (opinion of the Court). AFDC, like Title I, is a voluntary program. *See* 42 U.S.C. § 601. A state may choose not to participate in order to avoid federal requirements. Title I, however,

unlike AFDC, serves to supplement existing state programs rather than to create ones that are jointly financed. States did not create school systems in order to benefit from Title I. Prior to 1935, support of dependent children was not provided by many states. For example, prior to 1935, the Texas Constitution prohibited the Texas Legislature from granting public money to any individual except indigent and disabled confederate soldiers and sailors and their widows or in the event of a public calamity. Tex.Const. art. 3, § 51. When the federal government enacted the Social Security Act in 1935, the State Constitution was amended. Subsequently, in 1937, the Texas Constitution was amended to authorize subsistence for needy children. *Id.* at § 51a(3).

118. In the pretrial order, the plaintiffs also argued that section 21.031 was pre–empted by the Immigration and Naturalization Act. That issue of law was not addressed in the plaintiffs' final arguments or in their post–trial briefs. In the event that the plaintiffs continue to urge pre–emption on this basis, the court notes that the Immigration and Naturalization Act does not pre–empt the State law. Except insofar as the statute intends to inhibit immigration, it is not an exercise of an exclusive federal power and it is not state legislation in a field occupied by congressional legislation. Further, it stands as no conflict to the federal scheme to deny admission and to deport or to require the voluntary departure of those without documents. If there is a congressional purpose to allow undocumented aliens to enjoy the same benefits as resident aliens while the former are here clandestinely, or not to seek the deportation of children, that purpose is not expressed in a specific provision of federal law. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). *See* Note, 14 Tex.Int'l L.J. 289, 297–98 (1979). Moreover, the State's regulations demonstrate efforts to remove any conflict between the state statute and the federal scheme by using federal immigration documents to identify those who are "legally admitted." *See* R. Katz & H. Lenard, The Demise of the Implied Federal Preemption Doctrine, 4

## IV. INTERNATIONAL LAW AND FOREIGN POLICY

### A. Section 21.031 and United States Treaty Obligations

The United States is a member of the Organization of American States, having ratified that organization's Charter on June 19, 1951. 2 U.S.T. 2394, T.I.A.S. No. 2361 (entered into force December 13, 1951). The Charter was amended by the 1967 Protocol of Buenos Aires, which was ratified by the United States on April 26, 1968. T.I.A.S. No. 6847, O.A.S.T.S. No. 1–A, O.A.S. O.R., O.E.A./Ser. A/2, add 2 (entered into force February 27, 1970). Among the provisions of the amended Charter are several articles dealing with education. Article 31 provides:

> To accelerate their economic and social development, in accordance with their own methods and procedures and within the framework of the democratic principles in the institutions of the inter–American system, the member states agree to dedicate every effort to achieve the following basic goals:
>
> . . . . .
>
> h) Rapid eradication of illiteracy and expansion of educational opportunities for all; . . .

Article 47 provides:

> The Member States will exert the greatest efforts, in accordance with their constitutional processes, to insure the effective exercise of the right to education, on the following bases:
>
> a) Elementary education, compulsory for children of school age, shall also be offered to all others who can benefit from it. When provided by the State it shall be without charge;
>
> b) Middle–level education shall be extended progressively to as much of the population as possible, with a view to social improvement. It shall be diversified in such a way that it meets the

development needs of each country without prejudice to providing a general education; and

> c) Higher education shall be available to all, provided that, in order to maintain its high level, the corresponding regulatory or academic standards are met.

The plaintiffs assert that Article 47 of the amended Charter is a self–executing treaty provision which invalidates section 21.031 under the supremacy clause, U.S.Const. art. VI, cl. 2.

A treaty is an international agreement of a contractual nature between two or more independent nations. Treaties made under the authority of the United States are the supreme law of the land. Nonetheless, a treaty becomes the internal law of the United States and has the effect of domestic law only when that treaty is given effect by congressional legislation or is, by its nature, self–executing. *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 311, 7 L.Ed. 415 (1829); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir. 1979); *Sei Fujii v. State*, 38 Cal.2d 718, 242 P.2d 617 (1952); Restatement (Second) of Foreign Relations Law of the United States, § 141 (1965) (hereinafter Restatement). According to the Restatement, "[n]ot all treaties made by the United States have immediate effect as domestic law in the United States upon becoming binding between the United States and the other parties. . . ." Restatement § 141, comment a at 432. A treaty becomes effective as domestic law of the United States at the time it becomes binding on the United States if it is self–executing, or, if it is nonself–executing, only when it is implemented by act of Congress.

Whether a treaty is self–executing is a matter of interpretation to be determined by the courts. *United States v. Postal*, 589 F.2d 862, 876 (5th Cir. 1979); *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.

---

Hastings Const.L.Q. 295, 316 (1977). The use of categories created by federal law may remove the conflict between the state and federal law, but when immigration categories are used,

it may be unlikely that those categories are related to a permissible state interest in the context of an equal protection challenge.

Cir. 1976). There are two principal elements to the question whether a treaty is self–executing. First, the language of the treaty must manifest that the parties intend to confer rights or obligations on the citizenry of the compacting nations. *See People of Saipan v. United States Dep't of Interior*, 502 F.2d 90, 101 (9th Cir. 1974) (Trask, J., concurring). Second, "if the instrument is uncertain, recourse may be had to the circumstances surrounding its execution. . . ." *Sei Fujii v. State*, 38 Cal.2d 718, 721–22, 242 P.2d 617, 620 (1952). Applying those principles, the court concludes that Article 47 of the amended Charter of the Organization of American States was not intended to be self–executing; it was "not addressed to the judicial branch of our government." *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C.Cir. 1976).

Article 47(a) is no doubt sufficiently direct to imply the intention to create affirmative and judicially enforceable rights. The article read as a whole, however, belies that construction. Article 47 begins with the statement that "The Member States will exert the greatest efforts, in accordance with their constitutional processes, to insure the effective exercise of the right to education. . . ." This is not the kind of promissory language which confers rights in the absence of implementing legislation. The parties have engaged to perform a particular act, that is, to exert the greatest efforts to advance the cause of education. They have not contracted to provide free public education to all children of school age within the country. The court concludes that Article 47 of the amended Charter of the Organization of American States is a non self–executing treaty and that it does not invalidate inconsistent state laws.[119]

## B. Section 21.031 and the Conduct of Foreign Affairs

■ The Constitution entrusts the conduct of foreign affairs to the President and the Congress. A state statute that intrudes into or interferes with the conduct of foreign policy cannot stand. The plaintiffs assert that section 21.031 must be invalidated under the supremacy clause, U.S.Const. art. VI, cl. 2, because it impermissibly interferes with federal foreign policy. They maintain that the eradication of illiteracy and the expansion of educational opportunities are elements of our foreign policy, and they contend that these elements are evidenced by treaties, international agreements, and active support for the international recognition of human rights.[120]

■ The twentieth century has been marked by the waning of the nation-state.[121] One off–spring of this historical trend is the internationalization of human rights. Documents such as the Charter of the United Nations and the Charter of the Organization of American States exemplify recognition of rights of provisions secured against the state. The protection of these asserted rights has become the concern of the international community. For example, the International Court of Justice rendered an Advisory Opinion on the question of

---

**119.** The court is aware of other problems with the plaintiffs' position that Article 47 is supreme domestic law. Having reached the conclusion that Article 47 is a non self–executing treaty provision, it is unnecessary to discuss such issues as the effect of the "Bricker–like" reservation made by the Senate at the time of ratification and whether the United States may legislate in the area of human rights through the exercise of the treaty power.

**120.** A similar argument was first made by the United States in their briefs in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The government contended that Articles 55 and 56 of the United Nations' Charter, although non self–executing, represented the public policy of the United States. The Supreme Court did not address that argument in their opinion. *See* Note, 36 Va.L.Rev. 1059, 1080 (1950).

**121.** For a concise and engrossing description of this trend, *see* E. Murphy, Children of the Eighth Day: The Role of International Lawyers in a Post–Modern World, 13 Int'l. Law. 681, 684–85. The change of emphasis from the nation–state to a broader transnational community is perhaps best illustrated by the difference between the Charter of the League of Nations which emphasizes "the equality and sovereignty of nations" and the Charter of the United Nations which purports to subject nations to a supra-national authority.

continued South African dominion of Namibia.

Under the Charter of the United Nations, the former Mandatory [South Africa] had pledged itself to observe and respect, in a territory having an international status, human rights and fundamental freedoms for all without distinction as to race. To establish instead, and to enforce, distinctions, exclusions, restrictions and limitations exclusively based on grounds of race, colour, dissent or national or ethnic origin which constitute a denial of fundamental human rights is a flagrant violation of the purposes and principles of the Charter.

[1971] I.C.J. Rep. 16 at ¶ 131. The United States has been an active participant in this effort to make human rights a subject for international concern in territories having national, as well as international, status. Nonetheless, as a legal concept and fact, the nation–state has not been replaced as yet by a supra–national entity. The court concludes that the pursuit by the United States of rights and justice in the international community does not displace domestic law.

■ An understanding of the plaintiffs' contention requires emphasis on one point. Internationally recognized human rights may not supercede inconsistent state laws because of their prescriptive or normative content, or even because they are descriptive of rights having their basis in reason, natural law, utility, religion, power, economic class or history. Thus, what is essential about the right to education in this context is that it is asserted to be an element of our foreign policy. The constitutional regard for the particular right is irrelevant. In addition, it would follow that all other rights recognized by international treaties, international agreements, and active support by the Executive should similarly displace inconsistent state laws. After examining the international basis for the right to education and other internationally recognized rights, the court will discuss those cases which have found state law intruding into the conduct of foreign affairs.

A treaty, even if non self–executing, evidences federal activities and policy in the field of foreign affairs. Accordingly, even though Article 47 of the amended Charter of the Organization of American States is not a self–executing treaty provision, it demonstrates a federal commitment to education which we have affirmed to the international community. Before deciding whether the right to education is a component of foreign policy which ousts inconsistent state law, other rights of provision found in the amended Charter should be considered. This is necessary because the executive and legislative intent to make these provisions a part of foreign policy, thereby overriding state and federal laws, must be considered. The "shifting winds at the State Department" cannot control whether a particular state statute is in conflict with the United States conduct of foreign relations. *See Zschernig v. Miller*, 389 U.S. 429, 443, 88 S.Ct. 664, 672, 19 L.Ed.2d 683 (1968) (Stewart, J., concurring). Nonetheless, whether the signing and ratification of a treaty was such an exercise of foreign policy that the states thereafter are prevented from enacting inconsistent laws regarding activities traditionally within their sphere is an issue which may be resolved by construing the intent of those who signed or ratified.

■ Article 31 is a sufficient example of the breadth of the rights recognized by the amended Charter.

## Article 31

To accelerate their economic and social development, in accordance with their own methods and procedures and within the framework of the democratic principles and the institutions of the inter–American system, the Member States agree to dedicate every effort to achieve the following basic goals:

a) Substantial and self–sustained increase in the per capita national product;

b) Equitable distribution of national income;

c) Adequate and equitable systems of taxation;

d) Modernization of rural life and reforms leading to equitable and efficient land–tenure systems, increased agricultural productivity, expanded use of undeveloped land, diversification of production; and improved processing and marketing systems for agricultural products; and the strengthening and expansion of facilities to attain these ends;

e) Accelerated and diversified industrialization, especially of capital and intermediate goods;

f) Stability in the domestic price levels, compatible with sustained economic development and the attainment of social justice;

g) Fair wages, employment opportunities, and acceptable working conditions for all;

h) Rapid eradication of illiteracy and expansion of educational opportunities for all;

i) Protection of man's potential through the extension and application of modern medical science;

j) Proper nutrition, especially through the acceleration of national efforts to increase the production and availability of food;

k) Adequate housing for all sectors of the population;

l) Urban conditions that offer the opportunity for a healthful, productive, and full life;

m) Promotion of private initiative and investment in harmony with action in the public sector; and

n) Expansion and diversification of exports.

Without in any way disparaging the admirable goals represented by Article 31, the court concludes that the President and the Congress did not enter into this treaty as an act of foreign relations which displaces inconsistent state law. Article 31 also should not be used by the judicial branch as a test for all state and federal statutes which touch on the subjects embraced by the Article. If signing a treaty necessarily had the effect of displacing inconsistent state and federal laws, the question of whether a treaty was self–executing and thus had the effect of domestic law would be unnecessary.

The reservation made by the Senate when ratifying the Charter supports the conclusion that it was not an act of foreign policy ousting the states' ability to interfere with the achievement of the goals established in the Charter.

[T]he Senate gives its advice and consent to ratification of the Charter with the reservation that none of its provisions shall be considered as enlarging the powers of the Federal Government of the United States or limiting the powers of the several states of the Federal Union with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.

The Charter of the Organization of American States is not a superior federal policy to which state law must yield when it impairs the policy represented by that Charter.

The court's analysis of the effect of the signing and ratification of the Charter of the United Nations proceeds along the same lines. Articles 55 and 56 of the Charter state:

### Article 55

With a view to the creation of conditions of stability and well being which are necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self–determination of peoples, the United Nations shall promote;

a. higher standards of living, full employment, and conditions of economic and social progress and development;

b. solutions of international economic, social, health, and related problems; and international cultural and educational cooperation; and

c. universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language or religion.

## Article 56

All Members pledge themselves to take joint and separate action in cooperation with the Organization for the achievement of the purposes set forth in Article 55.

The Universal Declaration of Human Rights, G.A.Res. 217A, 3 U.N.Doc. A1810 (1948), was adopted unanimously by the U.N.General Assembly with active support and participation in its drafting, in 1948. The Universal Declaration is considered an authoritative interpretation of Article 55 of the U.N. Charter. Article 26 of the Universal Declaration states:

1. Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.

2. Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.

3. Parents have a prior right to choose the kind of education that shall be given to their children.

Once again, to determine whether the United Nations Charter in conjunction with the Universal Declaration was meant as an exercise of the power over foreign affairs, it is useful to examine other provisions which must stand on the same footing. Article 24 speaks of the right to "periodic holidays with pay." Article 25 establishes that

Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.

Article 27(a) provides for "the right to the protection of the moral and material interest resulting from any scientific, literary or artistic production of which he is the author."

Like the goals set forth in the amended Charter of the Organization of American States, these are admirable principles. They represent standards toward which all societies should strive, and, because of our relative prosperity, we should achieve. Holding those principles in high esteem does not mean that the City of Houston could not constitutionally decline to provide its workers with paid vacations or that the State of Texas intrudes into foreign relations if it denies a person the right to education. Indeed,

As the General Assembly neared its final vote on the Declaration, Mrs. Franklin D. Roosevelt, as the Chairman of the Commission on Human Rights and a representative of the United States in the Assembly stated:

In giving our approval to the declaration today, it is of primary importance that we keep clearly in mind the basic character of the document. It is not a treaty; it is not an international agreement. It is not and does not purport to be a statement of law or of legal obligation. It is a declaration of basic principals of human rights and freedoms, to be stamped with the approval of the General Assembly by formal vote of its members, and to serve as a common standard of achievement for all peoples of all nations.

5 Whiteman, Digest of International Law 243 (1965). Thus, although the United States is obligated to promote the right to education as an integral part of the "human rights and fundamental freedoms" guarded by the U.N. Charter, the states are not interfering with federal foreign policy when they interfere with that obligation.

The plaintiffs also point to other international instruments which support their position that the right to education is universally recognized. The American Declaration of the Rights and Duties of Man, O.A.S. O.R., O.E.A./Ser. L/V/II, 23, Doc. 21, Rev. 2 (English 1975); The International Covenant on Economic, Social, and Cultural Rights, G.A.Res. 2200 A (XXI) (1966); The International Covenant on Human Rights, O.A.S.T.S. No. 6, at 1, O.A.S.O.R., O.E.A./Ser., L/V/II, 23, Doc. 21 Rev. 2 (English 1975); The Declaration on the Rights of the Child, G.A.Res. 1386 (1959). These human rights instruments recognize the right of all persons to literacy or to a free primary education. The plaintiffs also point to the emphasis by the current administration on the international recognition of all human rights. That the State denies undocumented children the right to education may be hypocritical; it is not an impermissible interference with the power to conduct foreign relations.

There is no recorded decision which holds that the federal recognition of human rights, by itself, prevents the states from interfering with the enjoyment of those rights. The cases on which the plaintiffs rely were resolved on a much narrower basis.

In *Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), the Supreme Court struck down an Oregon statute which conditioned a non-resident's right (legal, not human) to inherit property in Oregon on the satisfaction of three requirements:

 (1) The existence of a reciprocal right of a United States citizen to take property on the same terms as a citizen or inhabitant of a foreign country;

 (2) The right of United States citizens to receive payment here of funds from estates in a foreign country; and

 (3) The right of the foreign heirs to receive the proceeds of Oregon estates "without confiscation."

*Id.* at 430–31, 88 S.Ct. at 665. Superficially, this statute was an exercise of Oregon's legitimate power to regulate descent and distribution. The manner of application of the statute, however, revealed that Oregon used it as a vehicle to launch

 inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called "rights" are merely dispensations turning upon the whim or caprice of government officials, whether the representation of counsels, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.

*Id.* at 433, 88 S.Ct. at 667. This "search for the 'democracy quotient' of a foreign regime" was interference with foreign policy in the traditional sense: the Oregon courts used the statute to assess the validity of foreign governments.

Similarly in *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1936), the Court held that New York could not undermine or question a compact between the United States and the Soviet Union. This principle was reaffirmed in *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1941). The Court stated that the New York policy "refuses to give effect or recognition in New York to acts of the Soviet Government which the United States by its policy of recognition agreed no longer to question." *Id.* at 231, 62 S.Ct. at 566.

This case does not involve a state policy which questions the validity of a foreign government. There is no basis to conclude that the statute is an irritant to a foreign state, such as Mexico. Any conflict between section 21.031 and our friendly relations with Mexico is insubstantial. *Cf. New York Dep't of Social Sers. v. Dublino*, 413 U.S. 405, 423 n. 29, 93 S.Ct. 2507, 2518 n. 29, 37 L.Ed.2d 688 (1973).

The strongest suggestions that our international support for the recognition of human rights invalidates state statutes which undermine the observance of those rights are found in the concurring opinions in *Oya-*

*ma v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1947). In *Oyama*, the Supreme Court considered a California statute which prevented aliens ineligible for citizenship from acquiring, owning, occupying, leasing or transferring agricultural land. Although the majority opinion did not mention the Charter of the United Nations, two separate concurring opinions referred to the treaty. Justice Black stated:

> we have recently pledged ourselves to cooperate with the United Nations "to promote . . . universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion." How can this nation be faithful to this international pledge if state laws which bar land ownership and occupancy by aliens on account of race are permitted to be enforced?

*Id.* at 649–50, 68 S.Ct. at 277. Justice Murphy added that

> this nation has recently pledged itself, through the United Nations Charter to promote respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language and religion. The Alien Land Law stands as a barrier to the fulfillment of that national pledge. Its inconsistency with the Charter, which has been duly ratified and adopted by the United States, is but one more reason why the statute must be condemned.

*Id.* at 673, 68 S.Ct. at 288. In answer to Justice Black's question, the court believes that we cannot fulfill our national pledge if our actions at home are inconsistent with the principles we espouse abroad, and that statutes which stand as a barrier to that fulfillment should be condemned. Nonetheless, the court cannot conclude that those concurring opinions and the international principles which they promote provide the basis for the recognition of justiciable rights which serve to invalidate, as well as condemn, inconsistent state law.

The conduct of foreign affairs in our system of government considered separately from the treaty power has not yet grown to embrace all areas that may be of concern to the international community. The constitutional delegation of the authority to conduct foreign affairs enables our nation to speak with one voice in our dealings with foreign governments and international organizations. That authority, in the absence of the exercise of the power to make treaties having the effect of domestic law, has not evolved to prohibit the states from enacting laws which may affect an area of international concern. The federal government may be able to invalidate a state law such as the one challenged in this action by entering into a self-executing treaty or by passing implementing legislation. That has not occurred, and the national pledge to which Justice Black has referred and the promotion of rights by our government do not make the nature of the treaty power irrelevant.

### C. Customary International Law

In *The Paquete Habana*, the Supreme Court stated

> International law is a part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.
>
> · · ·

This review of the precedents and authorities on the subject appears to us abundantly to demonstrate that at the present day, by the general consent of the civi-

lized nations of the world, and independently of any express treaty or other public act, it is an established rule of international law, founded on considerations of humanity to a poor and industrious order of men, and of the mutual convenience of belligerent States, that coast fishing vessels, with their implements and supplies, cargoes and crews, unarmed, and honestly pursuing their peaceful calling of catching and bringing in fresh fish are exempt from capture as prize of war.

175 U.S. 677, 700, 20 S.Ct. 290, 299, 302, 44 L.Ed. 320 (1900). The plaintiffs assert that the various treaties, agreements, declarations and covenants should be construed as customary international law, thus providing a rule of decision in this case.

■ As should be clear from the foregoing, the court concludes that the right to education, while it represents an important international goal, has not acquired the status of customary international law. This conclusion is founded on the nature of international law.

> The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another. Because of its peculiar nation–to–nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal.

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). In an earlier case, the Supreme Court stated

> In these circumstances, no question of international law, or of the extent of the authority of the United States in its international relations is presented. International law is a part of our law and as such is the law of all States of the Union

..., but it is a part of our law for the application of its own principles, and these are concerned with international rights and duties and not with domestic rights and duties.

*Skiriotos v. Florida*, 313 U.S. 69, 72–73, 61 S.Ct. 924, 927, 85 L.Ed. 1193 (1940).[122]

Aliens may have a better claim to the observance of the right to education than citizens. International law traditionally comprehends a nation's treatment of aliens. Every act which adversely affects an alien, however, does not contravene customary international law. To the extent that the United States is neglecting its pledge to promote human rights or to exert the greatest efforts to further educational opportunities, an alien's government may call the United States to answer before an international tribunal. In this court, the plaintiffs have not shown that a rule of decision arising from customary international law should be applied.

## V. CONCLUSION

The ruling of the court is not based on the primacy of treaties, federal legislation, or the power to conduct foreign relations. The immigration status of the plaintiffs also is not determinant. It is education that is the focal point of this case. Absent sufficient justification, the Constitution does not permit the states to deny access to education to a discrete group of children within its borders when it has undertaken to provide public education.

It is fitting that the importance of education provides the legal premise for our result, for it also permeates those considerations which, although not central or necessarily material to the legal analysis, confirm the irrationality of the State statute. The evidence introduced in this case demonstrates that, with the hope of saving some public funds today, we are creating an enormous public cost, both financial and social, to be borne in the not so distant future.

**122.** *See also* S. Bleicher, The Legal Significance of Re–Citation of General Assembly Resolutions, 63 Am.J.Int'l L. 444, 449 (1961) ("According to standard definitions a customary rule comes into existence only when there are acts of states in conformity with it, coupled with a belief that those acts are required by international law.") (footnotes omitted).

One fact remains free from serious dispute: the great majority of the undocumented children who have been or would be excluded from the public schools pursuant to the State statute are or will become permanent residents of this country. By denying them access to education we insure that most of them will become wards of society. As Bishop John Edward McCarthy testified:

> We are keeping certain people poor, and what we are manufacturing now is a monumental social cost to our society ten and fifteen and twenty years from now. . . . We are manufacturing ignorance; to be ignorant in society is to be nonproductive; to be nonproductive means for many instances to be forced into a state of crime. . . . [W]hether it be right now in the form of modest increases in tuition, in public school operating cost, or . . . in terms of social cost . . . fifteen years from now, we will pay this bill. . . .[123]

It is, of course, the prerogative of the State Legislature to saddle the public with such a future burden, provided it does so in conformance with the Constitution. That has not been accomplished.

Another aspect of this public question bears emphasis. As residents of a country which is re-examining its history and future as a home for persons of all nationalities and cultures, we cannot forget the role that the public schools have played providing unity to our community of immigrants. To insure that we do not fractionalize into a country of ethnic groups without shared goals and ideals, all of our social and public institutions must work to profit from our cultural diversity while working toward common interests. The institution which must continue to assume the greatest responsibility is the public school. We must remember that we strive to form a more perfect union and that the union comprises individuals. Our endeavor to create such a society will be frustrated if we deny a discrete group of children the chance to develop their individuality. The public schools

are the essential element in that development. As J. Glenn Gray has stated:

> The schools can at best seek to do their share in the task that concerns every other institution in our society. For if the development of individuality is the most comprehensive goal of our time and must be proceeded by a deep-going experience of community, formal education is only one of the means to insure either condition. Nevertheless, schools are more and more expected to provide the essential bulwark against the forces of impersonality, standardization, ruthlessness and discontinuity which threaten us today.

J. G. Gray, The Promise of Wisdom 65 (1968). The statute challenged in this proceeding seems either designed to breach this bulwark or to ignore the role that the excluded children are destined to play in the future of this State.

These practical concerns play little role in the adjudication of the constitutional issues presented here. Nonetheless, they do highlight the reasons supporting the conclusion that access to education is a fundamental right. Access to education not only is closely connected to the free exchange of ideas and information, it is central and preservative of the conditions which make life in a free society so precious.

The court will enter an order permanently enjoining the Commissioner of Education from implementing section 21.031(a)–(c) of the Texas Education Code.

The Clerk shall file this memorandum and shall provide counsel for all parties with a true copy.

---

**123.** Record, Vol. VII, 124–25.